Louis F. Teran (SBN 249494)
lteran@slclg.com
SLC LAW GROUP
1055 E. Colorado Blvd., Suite #500
Pasadena, CA 91106
Telephone:  (818) 484-3217 x200
Facsimile:  (866) 665-8877

Attorneys for Defendant
Benjamin D. Cook

# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TOPFIRE LIMITED, et al.,<br><br>             Plaintiffs,<br><br>     v.<br><br>BENJAMIN D. COOK,<br><br>             Defendant. | Case No.:  2:23-cv-02503-DAD-JDP<br><br>**DEFENDANT'S NOTION OF MOTION AND MOTION FOR THE DISQUALIFICATION OF PLAINTIFFS' EXPERT WITNESS, OR, IN THE ALTERNATIVE MOTION FOR SANCTIONS** |
| BENJAMIN D. COOK,<br><br>             Counter-Claimant,<br><br>     v.<br><br>TOPFIRE LIMITED, et al.,<br><br>             Counter-Defendant | |

DEFENDANT'S MOTION FOR DISQUALIFICATION OF EXPERT WITNESS

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on March 16, 2026 at 1:30 pm, in the above-entitled Court, with the Honorable Dale A. Drozd presiding, Defendant Benjamin D. Cook ("Defendant") will, and hereby does, move this Honorable Court to grant his Motion for the Disqualification of Plaintiffs' Expert Witness, or, in the alternative, Motion for Sanctions.

This motion is made pursuant Fed.R.Evid. 702 and is based upon the grounds that Plaintiff Topfire Limited, et al ("Plaintiff") has retained and submitted the expert report of Mr. Eric Noble ("Mr. Noble") as an engineering expert but failed to show that Mr. Noble has any degree or education in engineering, that Mr. Noble's opinion is not based on any facts, data, or reliable principles, and that Mr. Noble failed to comply with his Notice of Deposition by failing to produce any documents, including documents on which he relied and all drafts of his expert report.

This Motion will be based on this Notice of Motion, the Memorandum of Points and Authorities, the Declaration of Louis F. Teran, the pleadings on file with this Court, and such other argument and evidence which may be presented at the hearing on this matter.  This motion is made following a telephonic conference held by the corresponding counsel of record of the parties on January 30, 2026.

DATED:  February 9, 2026

By:_____
    Louis F. Teran
    Attorney for
    Defendant/Counter-Claimant
    Benjamin D. Cook

**MEMORANDUM OF POINTS AND AUTHORITIES**

Defendant/Counter-Claimant Benjamin D. Cook ("Defendant") hereby respectfully submits this Motion for the Disqualification of Plaintiffs' Expert Witness, or, in the alternative, Motion for Sanctions ("Motion"). Concurrent with this Motion, Defendant presents the declaration of Louis F. Teran. ("Teran Decl.").

## I. MR. ERIC NOBLE IS NOT QUALIFIED TO BE AN EXPERT IN THIS CASE

Fed.R.Evid. 702 expressly requires as follows:

> "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." See *Fed.R.Evid. 702*.

In the present case, Plaintiffs retained and submitted the expert report of Mr. Eric Noble ("Mr. Noble") as their expert witness. Thus, Section 702 requires Plaintiffs, as the proponent of Mr. Noble's expert testimony, to make an affirmative showing that Mr. Noble's opinion is admissible and reliable. As discussed in detail below, Plaintiffs are unable to make such affirmative showing because Mr. Noble is woefully unqualified, does not base his opinion on facts or data, and does not base his opinion on reliable principles.

### A. Mr. Noble Lacks the Required Education and Experience To Testify as an Expert in this Case

It is established that an expert witness must be qualified by knowledge, skill, experience, or education. See *Fed.R.Evid. §702*. The party seeking to exclude expert testimony because the expert is not qualified should show that the expert does not possess a higher level of knowledge, skill, experience, training, or education that an ordinary person. See *Fed.R.Evid. §104(a) and 702*. See also *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1042-43 (2d. Cir. 1995). See also *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d

1  717, 741 (3d. Cir. 1994).  For example, the expert does not have the practical experience
2  and necessary academic training to support the opinion.  See *Conroy v. Vilsack*, 707 F.3d
3  1163, 1168-69 (10th Cir. 2013).  See also *Bogosian v. Mercedes-Benz of N. Am.*, 104 F.3d
4  472, 477 (1st Cir. 1997).

In the present case, Mr. Noble portrays himself as an engineer with an expertise in automotive design but acknowledges that he does not hold any type of engineering degree or had any type of engineering education whatsoever.  In fact, Mr. Noble testified that the only degrees and educational training that he has relates to a Bachelor's Degree in Economics from Cal State Fullerton and an associates degree in Automotive Technology from a community college.  See *Teran Decl.,* Ex. D, p.14-16.  Such degree are nowhere close to being equivalent to an engineering degree by any stretch of the imagination. Nevertheless, Mr. Noble testified as follows:

> "Q:  Okay.  Very good.  So going to Paragraph 63 on Page 22 of your report, towards the middle of the paragraph, it says, 'In the accused design, loads are partitioned and transferred across mechanical, pin and through-hole joints.'  Do you see that?
> A:  Yes, I do.
> Q:  All right.  What basis do you have for this assertion?
> A:  Oh, as -- as an engineer --
> Q:  You're not an engineer.
> A:  I -- I don't agree with you on that assessment.
> Q:  Okay.  Go ahead.
> A:  In fact, I'm a qualified engineer.
> Q:  Okay.
> A:  In fact, in automotive, some of the best engineers don't have engineering degrees; right?  Obviously, you've got one, and I'm having to explain automotive terms to you.  So I don't agree with your assessment at all that I'm not an engineer.  I'm more than ADOSA in automotive engineering terms."  See *Teran Decl.,* Ex. D, p. 262-263.

Thus, Mr. Noble has no formal education or experience as an engineer.  The field of engineering is a highly technical field that requires years of formal education, training, and experience.  Engineering is not something the Mr. Noble can pick up by taking auto shop classes at a local community college.  Being an engineer is more complex than being

4

a mechanic, which Mr. Noble appears to mean by engineering.

As such, Mr. Noble does not have the knowledge, skill, experience, or education to be an expert in the field of engineering in this case.

**B. Mr. Noble's Opinion Is Merely a Hunch That Is Not Based on Facts, Reliable Principles, or Supported By Anything**

In its expert report, Mr. Noble asserts the following technical opinion:

> "In the accused design, loads are partitioned and transferred across mechanical, pin and through-hole joints." See *Teran Decl.*, Ex. A, p.22, ¶63.

Despite making such a technical assertion, Mr. Noble is unable to provide any support whatsoever for his assertion. In fact, in deposition, Mr. Noble testified as follows:

> "Q: … What, in this particular design, gives you the basis to make this assertion?
> A: Sir, I'm not giving you general answers. I'm giving you answers informed by my work in automotive engineering. And what I'll tell you is: When we have a load that enters a component, and we're -- I'm talking about the tab here -- right? -- that load has to resolve. That component in space can't do it. This isn't general theory. It's going to resolve where that interface is next. In this case, those tabs mechanically interface -- right? -- um, through mechanical, pin and through-hole joints.
> Q: Okay. Did you test for that?
> A: I don't need to test for that.
> Q: Okay. All right. Is there any book that you -- you referenced for what you just said?
> MR. CHEN: Vague. And, um, misstating prior testimony. Foundation.
> THE WITNESS: Since -- since you're – since I'm billing you for this time, I will very happily provided you every volume in a more than 1,000 book automotive reference library in my office.
> Q: Did you -- did you reference that when you wrote this?
> A: I didn't need to.
> …
> Q: Okay. You just know; is what you're saying? You just know that this is true? Is that what you're saying? I am so educated. I just know that this is true. Is that what you're saying? I didn't need to look at any textbook, any -- any book, anything. I didn't even need to do testing. I just know. Is that what you're saying?
> …
> A: What I'm saying is my experience for three decades of engineering in the automotive industry, plus the more than 1,000 volumes in my automotive

reference library has all informed me as to the manner in which loads transfer. And, in this case, yep. That 30 years of experience tells me if I fasten something with pins and through-holes and I put loads into it and it has no other interface, those loads are going to resolve through the through and pinhole mechanical fastening system. So yes, my experience tells me that." See *Teran Decl.,* Ex. D, p.268-271.

Thus, Mr. Noble bases his assertion on nothing more than his engineering experience when, in fact, he never attained any type of engineering degree or education. At best he took auto shop classes at a community college. Even more, Mr. Noble has not conducted any testing whatsoever or referenced any technical source to support his assertion. Essentially, this is nothing more than Mr. Noble's hunch about how loads are transferred through the accused design. Such is not reliable and does not comply with the strict requirements of Fed.R.Evid. 702.

Then, in his Report, Mr. Noble asserts as follows regarding how stress passes through the accused design:

> "Stress passes through fastener clearances, adhesive layers, or snap-fit lands, introducing joint compliance, stress concentrations, and multi-stack tolerances." See *Teran Decl.,* Ex. A, p.22, ¶63.

Then, in deposition, Mr. Noble provided the following testimony when asked about his basis for this assertion:

> "Q: … Did you test to see whether your assertion here is true and accurate for the design that is at issue in this case, the accused product?
> MR. CHEN: Vague. Foundation. And, um, misstating prior testimony.
> THE WITNESS: Your question is akin to asking a physicist if he's testing Newton's Law, and what I would say is, as an experienced engineer, there are things I don't have to test for. That's how we move forward." See *Teran Decl.,* Ex. D, p. 272.

Then, in his Report, Mr. Noble further asserts as follows regarding the accused design:

> "Collar and tab may even have different coefficients of thermal expansion and forced vibration damping, leading to varying performance under thermal or vibrational cycling." See *Teran Decl.,* Ex. A, p.22, ¶63.

6

Then, in deposition, Mr. Noble provided the following testimony when asked about his basis for this assertion:

> "Q: Did you test for this?
> A: I don't have to.
> Q: Okay. Did you test for it?
> A: No.
> Q: Okay. Did you reference any book? Anything that would support this assertion of yours?
> A: As an expert, it would be quite foolish of me to use the Court's time -- I'll set yours aside -- on me explaining that urethane has different dimensional and thermal characteristics and vibrational characteristics than hard plastic. So you are correct. I did not include that kindergarten-level explanation in my report. I apologize.
> Q: Is urethane involved in the accused design?
> A: I've called it a urethane-like. I hadn't testified to the compositions of their structure.
> Q: So let me ask again. Is urethane involved in any way in the accused product?
> MR. CHEN: Vague. Foundation. Go ahead.
> THE WITNESS: I -- I did not gather from the accused -- the firm that manufactured the accused, the exact chemical compositions of what they've used.
> …
> Q: All right. Well, you indicated that that's how urethane behaves --
> A: I'm giving --
> Q: -- and there's no -- there's no evidence that urethane is even involved in the accused product. So let me ask again. The statement that you make here, "Collar and tab maybe even have different coefficients of thermal expansion." Do -- does the collar and the tab in the accused product have different coefficients of thermal expansion and forced vibration damping?
> A: Those are different materials quite quickly, so the answer to that is, yes.
> Q: Okay. How do you know that?
> A: Because I'm a experienced engineer, and that's why I'm here. Thank you.
> Q: Okay. Did you reference anything or did you test to see what the coefficients of thermal expansion and forced vibration damping of the collar and tab in the accused product?
> A: No. And nor did I give a primer on how sine waves can be used to represent vibration. My assumption is that, as an engineer, some things are simply understood, and we try to move forward with our opinions." See *Teran Decl.*, Ex. D, p. 271-275.

1    Then, in deposition, Mr. Noble acknowledges that he has never taken any notes or
2 conducted any testing in this analysis of the accused product in this case.  Mr. Noble
3 testified as follows:

> "Q:  …And then, you go on to say, 'The accused design yields different and measurable results.'  What are those measurable results?  What testing did you do to achieve those measurable results?
> A:  Well, disassembly, for one.
> Q:  Okay.  What else?
> A:  Well, I can -- I can palpitate the materials to know those materials have different characterizations.
> Q:  Is that measurable?
> A:  Well, of course.
> Q:  Did you measure it?
> A:  It's -- do you want to know to what degree?
> …
> Q:  I want to know if you measure that.
> A:  I -- I can -- I can start.
> Q:  I know you can.· I'm asking if you did.
> A:  Let me know when I'm allowed to use a compound sentence, sir.
> Q:  Go ahead.
> A:  All right.  I can start by disassembly; right?  So is that measurable?  Yes.  I can do it. Can I do it or not.  If so, how difficult is it; right?  Are these all things I can assess?  Can I palpitate the tabs?  Yes.  Can I palpitate the harder ring?  Can I palpitate the rings?  Can I determine that those are different materials with different characteristics?  Yes.  Did I put -- did I put those on presses and measure pressures?  Did I take them to failure mode?  No and no.  But I certainly can measure those things empirically by beginning with a good field examination, which I did.  That's not hard.
> Q:  But you didn't measure anything?
> A:  I did measure.
> Q:  Okay.  Do you have -- do you have any records of the examination that you performed on the accused product?
> A:  No, sir."  See *Teran Decl.,* Ex. D, p.281-283.

     Thus, Mr. Noble acknowledged that he did not test anything, he did not measure anything, and he did not even keep any record of his observations in this case.  Essentially, he seems not to have done anything to derive at his opinion in this case.  Such is not reliable expert testimony pursuant to Fed.R.Evid. 702.  In fact, in deposition, Mr. Noble acknowledged that part of his opinion is mere speculation.  He testified as follows:

8

"Q: All right. So then, you go on to say, um, some of the measurable results, apparently, include potentially greater retention decay over time due to the joint relaxation.
A: Um-hum.
Q: How did you test for this?
A: It's -- it's -- that's why I used the word 'potentially.'
Q: So this is a speculation?
A: It's potential, and that's exactly what I've written.
Q: So this is not something that is present in the accused design, the accused product?
A: The -- the potential for greater retention decay over time is certainly present, and that's why I've written it as such.
Q: Okay. And what is the basis for that? What is the basis for you saying that the potential for greater retention of decay is greater over time?
A: Because of the disparate nature of the materials and the mechanical fastening system.
Q: And what is the material?
A: We know that one of them is a softer, more elastic material; and one of them is a hard, less elastic material. I've already stated, don't know the exact chemical composition. They both seem to be synthetics.
…
Q: Sure. Is -- is -- is it true that you do not have any testing records or records of examination to support any of the assertions that you make here in Paragraph 64 of your report?
…
A: All right. As a matter of engineering principle -- right? -- each of the things discussed here, I don't need testing to show. They are -- they are widely understood, particularly in the automotive field. Compound sentence: I, therefore, at this point, have not empirically tested those systems to put numeric values to -- to the -- to those descriptions.
…
Q: …Do you have any anything, any testing, any report, any data, um, that would support that any of the things that you wrote in Paragraphs 63 and 64 of your report is true and accurate?
…
A: Insofar as those are generally understood principles by automotive engineers, I have not found it necessary to do such testing, nor is it included herein.
Q: All right. And so when you say they're understood principles, um, how is it that they're understood principles? What did you refer to, um, establish that these are understood principles?
MR. CHEN: Foundation. Vague. Compound. Okay.
THE WITNESS: I suppose I could tell you, and you could impune me for that, that I've never gone and done primary fundamental testing on gravity either. At

some point, as an engineer, I have to understand that certain relationships exist. And in order to move forward, I have to take those as givens. In this case, the principles I'm citing in 64 are so rudimentary that any engineer, particularly in my field of automotive, would look at them and exclaim, next. And, by that, I mean, yes, widely understood; right?· Did I need to measure to prove any of them? No. Nobody would. Could I? Yes, right. Um, I'm not cheap, and I'd be happy to do it, but, so far, I haven't been asked." See *Teran Decl.,* Ex. D, p.283-288.

Accordingly, none of the technical and engineering opinions asserted by Mr. Noble in this case are supported by any facts, data, or reliable principles and methods as required by Fed.R.Evid. 702. As such, Mr. Noble's expert opinion is nothing more than his baseless hunch and not reliable by any stretch.

## II. IN THE ALTERNATIVE, SANCTIONS ARE PROPER BECAUSE MR. NOBLE FAILED TO COMPLY WITH REQUEST TO PROVIDE DOCUMENTS AND THINGS ON WHICH HE RELIED

If the Court does not disqualify Mr. Noble as an expert witness, then Defendant respectfully request this Court to issue sanctions against Plaintiffs in the form of a second deposition of Mr. Noble at Plaintiffs' expense. Such sanctions are proper because Mr. Noble appeared at his deposition unprepared and without any of the documents requested in the Notice of Deposition, including documents on which he relied for his opinions and prior drafts of his expert reports.

In fact, Request No. 2 in the Notice of Deposition that was served on Mr. Noble requested to bring to the deposition the following:

> "REQUEST NO. 2: Any and all materials and DOCUMENTS which YOU used, either directly or indirectly to form the basis of any assumptions, opinions, and/or conclusions concerning any of the issues in this case, including but not limited to any and all physical products, patents, or Amazon listings." See *Teran Decl.,* Ex. C.

However, Mr. Noble appeared at the deposition without a single document or anything. He simply ignored his duty to bring documents and things that he used to form his opinions in this case. In fact, when asked about it, Mr. Noble testified as follows:

10

> "Q: Do you understand that you were requested to bring that document here today?
> …
> A: That was not my understanding.
> Q: Okay. What made you not understand that? Is the notice of deposition unclear?
> A: In large cases with more experienced deposing teams --
> Q: Well, you know, I don't want to know about larger cases. I am talking about this case here today. And I am talking -- I'm asking you a very specific question.
> …
> A: My understanding was that professional opposing counsel would have come with all documents around which opposing -- deposing counsel would have wanted to cite and have me review." See *Teran Decl.,* Ex. D, p.95-96.

> "Q: So it sounds like three -- three physical products that you examined; is that correct?
> A: Of -- of the accused?
> Q: Yes. I think it's three.
> A: Okay. I don't remember them by their marketing names. Forgive me.
> Q: Okay. Did you bring those products with you today?
> A: I did not.
> Q: And why is that?
> A: I hadn't -- forgive me. I know you're probably going to tell me otherwise, but, as an expert on other larger, longer cases, I've never been requested to bring the physical evidence with me.
> Q: Did you receive the notice of deposition?
> A: I did, sir.
> Q: And Request No. 2 asks for that, does it not?
> A: You're telling me it does. I believe you.
> Q: Okay. And you read this; correct?
> A: Yes.
> Q: And you saw that it requested you to bring these materials with you; correct?
> A: Forgive me. I have -- I have become used to having them available during depo. I apologize." See *Teran Decl.,* Ex. D, p.209-211.

Without being able to attain the documents and things that Mr. Noble relied in making his opinion, Defendant was deprived of an opportunity to fully depose Mr. Noble. Besides, Mr. Noble's failure to comply with the Notice of Deposition is unreasonable and unjustified.

In addition, Request No. 5 in the Notice of Deposition that was served on Mr. Noble requested to bring to the deposition the following:

> "REQUEST NO. 5: Any and all billing sheets, notes, memoranda, written reports, and other documents, tangible evidence or writings which YOU have prepared or relied on in connection with YOUR involvement in this lawsuit." See *Teran Decl.,* Ex. C.

In response to this request, Mr. Nobel did produce a billing sheet. See *Teran Decl,* Ex. B. However, said billing sheet expressly indicates that he had written at least eight (8) versions of his report. In fact, his billing sheets indicates that on October 14, 2025, he charged for the following task:

> "10/14 EN - 4.3 hours editing Expert Report of Eric Noble, sending particle draft edits to Theodore Lee. Study and annotate Prior Art Cited in the Patent-in-Suit, sections B., C., D., E.,. Restart edits on revised Expert Report of Eric Noble v8 doc sent from client." See *Teran Decl.,* Ex. B.

Then on October 12, 2025, Mr. Noble charged for the following task:

> "10/12 EN - 4.1 hours review and partial edits of Expert Report V3 including Infringement / Noninfringement Analysis of Independent Claim 1" See *Teran Decl.,* B.

Thus, at the least, Mr. Noble's billing records confirm that there was a V3 or version 3 and a v8 or version 8 of his report. Yet, Mr. Noble failed to produce any of such versions of his Report. This is a clear acknowledgement that Mr. Noble did not produce all the documents it was required to produce pursuant to the Notice of Deposition. Without such documents, Defendant was unable to conduct a full and complete deposition of Mr. Noble.

Accordingly, Defendant respectfully requests this Court to issue sanctions in the form of a second deposition for which the costs must be incurred by Plaintiff.

## III. **CONCLUSION**

Based on the foregoing, Mr. Noble cannot qualify as an expert witness in this complex patent infringement case pursuant Fed.R.Evid. 702. In the alternative, if the

1  Court does not disqualify Mr. Noble, then Defendant respectfully requests this Court to
2  issue an order for Mr. Noble to appear for a second deposition at the expense of Plaintiffs.

8  DATED: February 9, 2026

By:_____
   Louis F. Teran

   Attorney for
   Defendant/Counter-Claimant
   Benjamin D. Cook