Louis F. Teran (SBN 249494)
lteran@slclg.com
SLC LAW GROUP
1055 E. Colorado Blvd., Suite #500
Pasadena, CA 91106
Telephone: (818) 484-3217 x200
Facsimile: (866) 665-8877

Attorneys for Defendant
Benjamin D. Cook

# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TOPFIRE LIMITED, et al.,<br><br>            Plaintiffs,<br><br>   v.<br><br>BENJAMIN D. COOK,<br><br>           Defendant. | Case No.: 2:23-cv-02503-DAD-JDP<br><br><br>**DECLARATION OF LOUIS F. TERAN** |
| BENJAMIN D. COOK,<br><br>         Counter-Claimant,<br><br>   v.<br><br>TOPFIRE LIMITED, et al.,<br><br>         Counter-Defendant | |

1    I, Louis F. Teran, declare as follows:

2    1.    I am counsel for all Defendant Benjamin D. Cook ("Defendant") in this

3    action.  I am more than 21 years old and am competent to give this Declaration.  The facts

4    stated in this declaration are based on my personal knowledge and are true and correct.

5    2.    I hereby submit this declaration in support of Defendant's Motion for the

6    Disqualification of Plaintiffs' Expert Witness, in the Alternative, Motion for Sanctions.

7    3.    Attached hereto as **Exhibit A** is a true and correct copy of the Expert Report

8    submitted by Mr. Eric Noble ("Mr. Noble") as Plaintiff's expert witness.

9    4.    Attached hereto as **Exhibit B** is a true and correct copy of the billing

10    statement that Mr. Noble submitted for his work done as Plaintiffs' expert witness,

11    including preparing his expert report.

12    5.    Attached hereto as **Exhibit C** is a true and correct copy of the Notice of

13    Deposition issued by Defendant for the deposition of Mr. Noble.

14    6.    Attached hereto as **Exhibit D** is a true and correct copy of relevant parts of

15    the transcript of the deposition of Mr. Noble.

16

17

18    I declare under penalty of perjury that the foregoing is true and correct.

19    Executed on February 9, 2026, in Pasadena, California.

20

21

22

23    By:_____

24    Louis F. Teran

25    Attorney for
      Defendant/Counter-Claimant
26    Benjamin D. Cook

27

28

2

# EXHIBIT A

Alexander Chen [SBN 245798]
Alexc@inhouseco.com
Katja M. Grosch [SBN 266935]
kmg@inhouseco.com
Theodore S. Lee [SBN 281475]
Tlee@inhouseco.com
**INHOUSE CO. LAW FIRM**
7700 Irvine Center Drive, Suite 800
Irvine, CA 92618
Telephone:  949-250-1555
Facsimile:   714-882-7770

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **TOPFIRE LIMITED**, a foreign company; **HK MIUSON INTERNATIONAL CO., LIMITED**, a foreign company; **JIANGGONGXIUSHENZHENGUOJI-MAOYIYOUXIANGONGSI**, a foreign company; and **SHENZHENSHILINGBINQIPEI-YOUXIANGONGSI**, a foreign company.<br><br>       Plaintiffs,<br><br>v.<br><br>**BENJAMIN D. COOK.**, an individual; and **DOES 1 through 10**, inclusive.<br><br>Defendants. | Case No. 2:23-cv-02503-DAD-JDP<br><br>**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE REGARDING UNITED STATES PATENT NO. 11,772,539 B2** |

INHOUSE CO. LAW FIRM

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................1

II.    QUALIFICATIONS AND EXPERIENCE INTRODUCTION .................................1

III.   MATERIALS CONSIDERED ..................................................................3

IV.    THE PATENT-IN-SUIT ........................................................................3

V.     THE ACCUSED PRODUCTS ..................................................................6

       A.  IDENTIFYING THE ACCUSED PRODUCTS  ....................................6

       B.  OPERATION OF THE ACCUSED PRODUCTS ....................................9

VI.    APPLICABLE LEGAL PRINCIPLES FOR INFRINGEMENT /
       NON-INFRINGEMENT ANALYSIS .........................................................11

       A.  DIRECT INFRINGEMENT ..................................................................11

       B.  CLAIM INTERPRETATION ................................................................12

       C.  LITERAL INFRINGEMENT ................................................................12

       D.  DOCTRINE OF EQUIVALENTS ........................................................13

            i.   The Function-Way-Result Test ...............................................14

            ii.  The Insubstantial-Difference Framework/Test ......................14

       E.  A PERSON OF ORDINARY SKILL IN THE ART ("POSITA")  ...................14

VII.   COURT'S CLAIM CONSTRUCTION......................................................15

VIII.  INFRINGEMENT / NON-INFRINGEMENT ANALYSIS....................................17

       A.  LITERAL INFRINGEMENT ANALYSIS OF
           INDEPENDENT CLAIM 1 ..................................................................17

            i.   Cylindrical cupholder ............................................................17

            ii.  Collar with integrated tabs....................................................17

            iii. Adapter base with expandable legs ........................................19

            iv.  Attachment member and fastener system ................................19

            v.   Literal Infringement Analysis: Conclusion.............................21

       B.  DOCTRINE OF EQUIVALENTS ANALYSIS OF "COLLAR
           WITH INTEGRATED TABS" LIMITATION OF CLAIM 1 ...........................21

            i.   Function .............................................................................21

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

INHOUSE CO. LAW FIRM

ii.  Way ................................................................................22

iii.  Result .............................................................................22

iv.  Insubstantial-Differences Analysis ...................................22

v.  Doctrine of Equivalents: Conclusion ...............................23

C.  CONCLUSION AS TO INFRINGEMETN / NON-INFRINGEMENT
ANALYSIS ...............................................................................23

IX.  APPLICABLE LEGAL PRINCIPLES FOR VALIDITY /
INVALIDITY ANALYSIS ...............................................................23

A.  INVALIDITY—ANTICIPATION ...........................................24

B.  INVALIDITY—OBVIOUSNESS ............................................24

X.  VALIDITY / INVALIDITY ANALYSIS ...............................................25

A.  VALIDITY / INVALIDITY ANALYSIS: INDEPENDENT CLAIM 1 ..............25

i.  Cylindrical cupholder with hollow internal volume .................................26

ii.  Collar with integrated tabs ......................................................28

iii.  Adapter to Act As the Base for the Cupholder ........................................30

iv.  Attachment Member on Bottom Surface ..................................................31

v.  Mounting Holes, Protrusions, and Fasteners ..........................................32

vi.  Conclusion as to Validity / Invalidity Analysis of Claim 1 .....................34

B.  VALIDITY / INVALIDITY ANALYSIS ON DEPENDENT CLAIM 2:
EXPANDABLE AND RETRACTABLE LEGS VIA ROTATION
OF THE CUPHOLDER ...............................................................34

i.  The Prior Arts Discloses Plurality of Legs Configured to Expand
and Retract Via Rotation of the Cupholder ...........................................35

ii.  Motivation to Include this Feature ...........................................38

iii.  Conclusion as to Validity / Invalidity Analysis of Claim 2 ....................38

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

C.  VALIDITY / INVALIDITY ANALYSIS ON DEPENDENT CLAIM 3:
ALIGNED AND NOT ALIGNED AXIS ........................................................39

 i.  Prior Arts Discloses Aligned and Not Aligned Axis................................39

 ii.  Motivation to Include Aligned and Not Aligned Axis ............................41

 iii.  Conclusion as to Validity / Invalidity Analysis of Claim 3 .....................42

D.  VALIDITY / INVALIDITY ANALYSIS ON DEPENDENT CLAIM 4:
MOUNTING HOLES OF ATTACHMENT MEMBER ENABLE
MULTIPLE CONFIGURATIONS.....................................................................42

 i.  Prior Art Discloses Mounting Holes Of the Attachment Member
Enabling Multiple Configurations...........................................................42

 ii.  Motivation to Include Attachment Member Enabling
Multiple Configurations..........................................................................43

 iii.  Conclusion as to Validity / Invalidity Analysis of Claim 4 .....................44

E.  VALIDITY / INVALIDITY ANALYSIS ON DEPENDENT CLAIM 5:
SPACER .........................................................................................................45

 i.  Prior Arts Discloses Spacer ....................................................................45

 ii.  Motivation to Include a Spacer ...............................................................46

 iii.  Conclusion as to Validity / Invalidity Analysis of Claim 5 .....................46

F.  VALIDITY / INVALIDITY ANALYSIS: DEPENDENT CLAIM 6:
SCREW GEAR PROVIDED TO ENABLE MOVEMENT OF LEGS
VIA ROTATION .............................................................................................46

 i.  Prior Art Discloses Screw Gear Enabling Movement of Legs
Via Rotation ...........................................................................................47

 ii.  Motivation to Include the Use of a Screw Gear.......................................48

 iii.  Conclusion as to Validity / Invalidity Analysis of Claim 6 .....................48

G.  VALIDITY / INVALIDITY ANALYSIS ON DEPENDENT CLAIM 7:
CUPHOLDER ADAPTER WHEREIN THE MINIMUM DIAMETER
IS 2.6 INCHES AND THE MAXIMUM DIAMETER IS 3.8 INCHES.............49

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**



INHOUSE CO. LAW FIRM

i.    Prior Art Discloses Adapter Base Operating Within Claimed Range ........49

ii.   Motivation to Include the Claim Range ....................................................49

iii.  Critical Rebuttal ...................................................................................51

iv.   Conclusion as to Validity / Invalidity Analysis of Claim 7 .....................51

H.  VALIDITY / INVALIDITY ANALYSIS ON DEPENDENT CLAIMS 2-7:
     CONCLUSION ..............................................................................................52

XI.    CONCLUSION    ..............................................................................................52

INHOUSE CO. LAW FIRM

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

## I.    <u>INTRODUCTION</u>

I, Eric Noble, hereby declare as follows:

1.    I submit this declaration in the matter of *Topfire Limited, et al. vs. Benjamin D. Cook* in the United States District Court in the Eastern District of California.

2.    I am over the age of twenty-one (21) and am competent to make this Declaration. All the facts herein are stated of my own personal knowledge and if called upon as a witness, I could and would competently testify thereto.

3.    I am being compensated at a rate of $470 per hour for my services, exclusive of any third party expert service fees. My compensation does not depend on the outcome of the pending litigation between Plaintiffs and Defendant in the United States District Court in the Eastern District of California.

## II.    <u>QUALIFICATIONS AND EXPERIENCE</u>

4.    Based on my education and experience in transportation design – including more than 25 years of direct consumer research– I have been asked to render an opinion regarding how a person of ordinary skill in the art ("POSITA") would have viewed and evaluated whether Plaintiffs' accused products practice the limitations of Defendant's U.S. Patent No. 11,772,539 (the "'539 Patent"). In forming this opinion, I have applied the Court's claim constructions and considered the asserted claims on an element-by-element basis. My analysis addresses whether each limitation of the asserted claims is satisfied by the accused products, either literally or under the doctrine of equivalents. Consistent with my role as a technical expert, I do not offer legal conclusions, but instead provide a technical assessment of how a POSITA, as of the effective filing date, would understand the scope of the claims and whether the accused products include the required structures, functions, and results described in the '539 Patent.

5.    In describing my professional work as "design," I do not mean design in the narrow sense of ornamental appearance, as is the focus of a design patent. In the automotive and consumer product fields, "design" encompasses both form and function. It includes not only the exterior styling of a component, but also the way the component operates, interfaces with other parts, and serves the end user. My practice involves evaluating and shaping products so that they meet consumer needs in terms of usability, ergonomics, durability, and performance, in addition to their visual appearance. Thus, when I state that I have designed or evaluated a product, I am referring to a holistic process that integrates both functional engineering considerations and consumer-facing aesthetics.

6.     I am the founder and president of The CARLAB, an advanced product design and consulting firm that helps manufacturers and suppliers plan and design new vehicles. The company defines and researches buyers, creates design briefs, and does development work for future vehicle programs. Founded in 1999, it is the most influential auto product consultancy in North America, serving Original Equipment Manufacturers (OEMs) from AvtoVAZ (AutoVAZ) to Ferrari, Toyota to Hyundai, suppliers from Continental to Michelin, and the energy industry. In addition to extensive work for Audi, Bentley, FCA, Ferrari, Ford, Honda, Hyundai/Kia, Lexus/Toyota, Mahindra, Subaru, Volvo, and Volkswagen vehicles including ICEs, NGVs, and BEVs, the company serves utilities (water, natural gas, electric), global auto clubs, and consumer product firms such as Samsung and Nike with design consulting and consumer research. A majority of my practice is consumer design research. I architect, conduct, and analyze large scale consumer research intended to determine normal consumers' perception of the design of whole vehicles, vehicle systems, and vehicle components. I regularly "moderate" such research, which means I interview individual, or groups of, consumer(s) about how they perceive proposed and existing vehicle designs, including interiors and interior components. Such ordinary buyer research is done virtually (e.g. online focus groups), or in-person and in response to three-dimensional properties or to two-dimensional images shown on screens. My interview work around three dimensional properties and/or screen images includes thousands of mainstream vehicle users over more than a quarter century, and influenced wide-selling production vehicle designs including Honda Civic, Nissan and Chevrolet pickups, Toyota Grand Highlander, Subaru Forester, and many Hyundai and Kia vehicles.  Consumer discussion of interior storage, including cupholder design and configuration is a regular part of such design testing.

7.     I am a Professor of Vehicle Technology in the Transportation Design Department at ArtCenter College of Design in Pasadena, the foremost car design program in the world, with alumni leading design studios at nearly every major automaker. A core aspect of my curriculum includes teaching students methods of testing prospective designs with ordinary consumers in order to determine aspects of importance to buyers. My teaching at ArtCenter places me at the center of the global automotive design community, where I train and collaborate with the next generation of vehicle designers and innovators. This role underscores that my expertise extends beyond aesthetics to

INHOUSE CO. LAW FIRM

encompass ergonomics, usability, durability, and performance—core considerations in the design and evaluation of automotive components, systems and whole interiors and exteriors.

8.      I also hold several patents on automotive components.

9.      I have served as an expert witness in automotive design cases, including *Straman v. Volkswagen* and *Tesla v. Fisker*.

10.     I have also served as a commentator and expert analyst on automotive design, a member of the Motor Press Guild, Society of Automotive Engineers (SAE), and the American Society of Mechanical Engineers (ASME).

11.     For a summary overview of my background and career, I refer to the attached **Exhibit 1**.

12.     I am actively acting as expert witness in the LKQ vs. GM cases for Irwin IP, LLP. I am also actively acting as expert witness in the case of Arex Industries, Inc. vs. Diode Dynamics, LLC. I have not testified as an expert witness in any other case in the previous 4 years.

### III.    MATERIALS CONSIDERED

13.     In preparing this Report, I have considered the documents listed in **Exhibit 2**, attached hereto, and any other materials identified herein. In forming the opinions expressed in this Report, I also relied upon my knowledge, experience, training, and education.

14.     The opinions stated in this Report are based on information currently available to me. I reserve the right to continue my investigation and study, which may include a review of documents and information that may yet be produced including expert reports, as well as any testimony from depositions for which transcripts are not yet available and that may yet be taken in this case. Therefore, I reserve the right to expand or modify this Report as my investigation and study continue, and to supplement my opinions in response to any additional information that becomes available to me, to any matters raised by the parties, and/or other opinions provided by the parties' expert(s). I may use exhibits and demonstratives in my testimony.

### IV.    THE PATENT-IN-SUIT

15.     I understand that Defendant Benjamin Cook is identified as the named inventor of U.S. Patent No. 11,772,539 B2, entitled "Cupholder and Adapter for Large Containers During Vehicle Use." The '539 Patent issued on October 3, 2023, from an application filed on April 21, 2023. The '539 Patent claims priority to (1) U.S. Patent Application No. 17/592,418, filed on February 3, 2022, which issued

INHOUSE CO. LAW FIRM

as U.S. Patent No. 11,660,995, and (2) U.S. Provisional Application No. 63/146,581, filed on February 6, 2021.

16.    The '539 Patent contains a total of seven claims: one independent claim and six dependent claims. The asserted claims are reproduced below for ease of reference.

> **1.** A cupholder adapter configured for use with an existing cupholder on a vehicle, the cupholder adapter comprising:
>
> a cylindrical cupholder having a hollow internal volume;
>
> a collar attached to a top portion of the cylindrical cupholder, wherein the collar includes a plurality of tabs extending perpendicularly into the hollow internal volume;
>
> an adapter base coupled to the cylindrical cupholder, wherein the adapter base includes a plurality of legs configured to expand and retract such that the diameter of the adapter base is configured to expand from a minimum diameter to a maximum diameter;
>
> an attachment member positioned on a bottom surface of the cylindrical cupholder, wherein the attachment member enables the coupling of the adapter base and the cylindrical cupholder; and,
>
> wherein the attachment member comprises a number of mounting holes and the adapter base or a spacer comprises a number of protrusions, at least one protrusion of the number of protrusions having a hole, wherein a mounting hole of the number of mounting holes is configured to align with the hole such that a fastener can extend through the mounting hole and the hole of the at least one protrusion of the number of protrusions.
>
> **2.** The cupholder adapter of claim **1**, wherein the plurality of legs are configured to expand and retract via rotation of the cupholder.
>
> **3.** The cupholder adapter of claim **1**, wherein the cylindrical cupholder is configured to be coupled to the adapter base in a variety of configurations including at least (a) the cylindrical cupholder's axis is aligned with the adapter base's axis; and (b) the cylindrical cupholder's axis is not aligned with the adapter base's axis.
>
> **4.** The cupholder adapter of claim **1**, wherein the number of mounting holes of the attachment member enable multiple configurations of the cylindrical cupholder in relation to the adapter base including an aligned configuration and off-set configuration.

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

INHOUSE CO. LAW FIRM

**5.** The cupholder adapter of claim **1**, further comprising at least one spacer positioned between the cylindrical cupholder and the adapter base.

**6.** The cupholder adapter of claim **2**, wherein a screw gear is provided to enable the movement of the plurality of legs via rotation.

**7.** The cupholder adapter of claim **1**, wherein the minimum diameter is 2.6 inches and the maximum diameter is 3.8 inches.

17.    Figure 5 included in the specification of the '539 patent illustrates the assembly of the invention claimed by the '539 patent. (Doc. No. 44, p3)



FIG. 5

18.    The invention consists of an adapter base (200) to fit the device into a vehicle's cupholder. This adapter base uses adjustable legs (201) to fit into the vehicle's cupholder, by expanding or retracting as necessary to fill the space within the vehicle's cupholder. On top of this base is a "spacer" (202) which creates vertical space between the vehicle's cupholder and the invention's cupholder. This spacer appears to be a component of an "adapter base" in claim 1 of the patent. The cupholder then attaches to this spacer via the usage of "mounting holes" and "protrusions." (Doc. No. 44, p4)

19.    Figures 8, 9, 10, and 11 of the '539 patent provide further detail of how the cupholder attaches to this adapter base. (Doc. No. 44, p4)

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**



20.    On the bottom of the cupholder (100) is an attachment member (110) which consists of "mounting holes" (111). On the top of the spacer (202) are protrusions (210). To secure the cupholder on top of the spacer, one or more of the protrusions in the spacer are aligned with the one or more of the mounting holes of the cupholder. Further, a protrusion with a hole in it (211) such that a fastener like a screw can be worked through a mounting hole on the attachment member (110) into that hole at the top of the protrusion. (Doc. No. 44, pp 4-5)

## V.    THE ACCUSED PRODUCTS

### A.  IDENTIFYING THE ACCUSED PRODUCTS

21.    The Plaintiffs' products accused of infringing on Defendant's 539 Patent are as follows (collectively, the "Accused Products" or individually, the "Accused Product"):

a.    Amazon.com ASIN: **B09NBKXSLL**

Item title: Upgraded Car Cup Holder Expander Adapter with Offset Adjustable Base, Compatible with Yeti 14/24/36/46oz Ramblers, Hydro Flasks 32/40oz, Other Large Bottles Mugs in 3.4"-4.0", 1 Pack

Link: https://www.amazon.com/gp/product/B09NBKXSLL

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**



b.  Amazon.com ASIN: **B09N8K3H8Y**

Item title: Upgraded Car Cup Holder Expander Adapter with Offset Adjustable Base, Compatible with

Yeti 14/24/36/46oz Ramblers, Hydro Flasks 32/40oz, Other Large Bottles Mugs in 3.4"-4.0", 2 Pack

Link: https://www.amazon.com/gp/product/B09N8K3H8Y

c.  Amazon.com ASIN: **B0BFWJNNRL**

Item title: SEVEN SPARTA Cup Holder Phone Mount for Car Cup Holder Expander Adjustable Base with 360° Rotation Cup Phone Holder for Car Compatible with iPhone Samsung Galaxy All Smartphones Upgrade 2-in-1

Link: https://www.amazon.com/gp/product/B0BFWJNNRL





- 7 -

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

INHOUSE CO. LAW FIRM

d.   Amazon.com ASIN: **B0CC1XPK1Z**

Item Title: Seven Sparta Car Cup Holder Tray, 2 in 1 Car Food Tray Cup Holder
Expander Compatible with Yeti, Hydro Flasks, Other Large Bottles Mugs in 3.4"-
4.0", Car Travel Accessories for Long Trips

Link: https://www.amazon.com/gp/product/B0CC1XPK1Z



e.   Amazon.com ASIN: **B09GLVQZ1Q**

Item title: Upgraded Large Cup Holder Expander for Car with Offset Expandable
Base Compatible with Yeti Mug10/14oz Yeti Rambler 20/24/26/30/36/46oz Hydro
Flasks 32/40oz Other Large Bottles in 3.4"-4" Diameter

Link: https://www.amazon.com/gp/product/B09GLVQZ1Q

f.   Amazon.com ASIN: **B0BD56KZ19**

Item Title: Master Show 2-in-1 Car Cup Holder Cell Phone Holder, Large Car Cup
Holder Expander with Phone Holder, Cell Phone Holder for Car, Compatible with
iPhone, Samsung & All Smartphones

Link: https://www.amazon.com/gp/product/B0BD56KZ19

22.   I understand that the cupholders identified by ASINs "B09NBKXSLL," "B09N8K3H8Y,"
"B0BFWJNNRL," "B0CC1XPK1Z," "B09GLVQZ1Q," and "B0BD56KZ19" are mechanically similar.
Each provides the same core functionality, including the ability to off-set the cupholder, and each
employs the same mechanism to achieve that function. The differences among these ASINs relate only

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

to packaging (single-pack versus two-pack) or to the inclusion of additional attachments, such as a phone holder or a food tray.

23.     In particular, ASIN "B09NBKXSLL" is a cupholder expander adapter. ASIN "B09N8K3H8Y" is a two-pack of the same adapter identified by ASIN "B09NBKXSLL." ASIN "B0BFWJNNRL" is the same adapter with the addition of a phone holder. ASIN "B0CC1XPK1Z" is the same adapter with the addition of a food tray. ASIN "B09GLVQZ1Q" is the same adapter under another brand. ASIN "B0BD56KZ19" is the same adapter with a phone holder under another brand and is materially the same as ASIN "B0BFWJNNRL" Because these products are mechanically the same in all respects relevant to the asserted utility patent, I will refer to and use the ASIN "B09NBKXSLL" as the exemplary or representative accused product. My analysis of this representative product applies equally to all of the other, above identified ASINs.

## B. OPERATION OF THE ACCUSED PRODUCTS

24.     The accused cupholder adapters include an attachment member located on the underside of the cupholder body. This attachment member contains two mounting holes and two protrusions.




Protrusions shown here

25.     The adapter base includes a central screw hole and a circular ring of thirty recesses or "negatives". These negatives are not through-holes but indentations designed to receive the protrusions

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

INHOUSE CO. LAW FIRM

on the attachment member. When the protrusions are seated in a selected pair of negatives, the cupholder is fixed in an off-set orientation relative to the adapter base. By rotating the cupholder and engaging different pairs of negatives in the adaptor base, the user can shift the off-set position of the cupholder in 30 discrete, angular increments. Each increment is held into position by the pair of male tabs on the cupholder, which insert into a corresponding pair of negatives available circumferentially around the adapter.



26.    When a screw is inserted through the central hole of the cupholder into the adapter base, the two protrusions on the attachment member engage with two of the negatives on the adapter base, and the cupholder and adapter base are aligned concentrically. When the screw is instead inserted through the second hole of the cupholder, the two protrusions on the attachment member engage with two of the thirty negatives on the adapter base. Depending on which pair of negatives the protrusions engage, the cupholder is fixed in an off-set position relative to the adapter base. By rotating the cupholder and repositioning the protrusions into different negatives around the ring, the user can shift the orientation of the cupholder relative to the adapter base by discrete angular increments.

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

## VI. APPLICABLE LEGAL PRINCIPLES FOR INFRINGEMENT / NON-INFRINGEMENT ANALYSIS

27.     I have not been asked to offer an opinion on the law; however, as an expert assisting the Court in determining infringement, I understand that I am obliged to follow existing law. Therefore, I have been asked to apply the following legal principles to my analysis.

28.     I have been informed by counsel that it is critical to distinguish between the defenses of non-infringement and patent invalidity, as they address fundamentally different legal inquiries concerning a patent's claims. Non-infringement is a factual defense that presumes the patent is valid and focuses solely on whether the accused product or process falls outside the scope of the claims. My analysis for non-infringement involves a meticulous, element-by-element comparison of the accused device against the claim language. To establish non-infringement, it must be demonstrated that the accused device omits at least one essential limitation recited in each independent claim. If an independent claim is not met, the non-infringement conclusion extends logically to all claims that depend from it.

29.     Conversely, the defense of patent invalidity is a direct challenge to the enforceability and legal standing of the patent claims themselves. This analysis compares the patent claims against the prior art (e.g., prior publications, patents, or public uses) to prove that the claimed subject matter lacked novelty (§102) or was obvious (§103) at the time of the invention. In the invalidity context, independent and dependent claims are considered separately. While invalidating a broad independent claim is significant, the narrower dependent claims must also be individually analyzed; they may remain valid if their additional limitations differentiate the invention sufficiently from the prior art, thereby acting as a critical fallback position for the patent owner. Ultimately, non-infringement is product-specific, while invalidity, if successful, permanently removes the claim from the legal landscape for all parties.

### A. DIRECT INFRINGEMENT

30.     A patent's claims define what is covered by the patent. A product directly infringes a patent if it is covered by at least one claim of the patent. Deciding whether a claim has been directly infringed is a two-step process. The first step is to decide the meaning of the '539 patent claim. The second step is to decide whether the accused has made, used, sold, offered for sale or imported within the United States a product covered by a claim of the patent. If it has, it infringes.

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

31.     One must consider each of the asserted claims of the patent individually, and decide whether the accused's product infringes that claim. The one exception to considering claims individually concerns dependent claims. A dependent claim includes all of the requirements of a particular independent claim, plus additional requirements of its own. As a result, if an independent claim is not infringed, then its dependent claims are not infringed. On the other hand, if an independent claim has been infringed, whether the additional requirements of its dependent claims have also been infringed must be separately decided.

32.     In forming my opinions, I have relied on my understanding of the governing law of direct infringement, which is reflected in 35 U.S.C. § 271 and the following cases: *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17 (1997); *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310-11 (Fed. Cir. 2005); *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1330-34 (Fed. Cir. 2001); *Seal-Flex, Inc. v. Athletic Track and Court Constr.*, 172 F.3d 836, 842 (Fed. Cir. 1999); *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993).

## B. CLAIM INTERPRETATION

33.     To determine whether an accused product has infringed the claims of a patent or whether the claims are valid, one must understand the patent claims. The Parties have stipulated to the construction of certain terms in the asserted patent claims. In addition, the Court has issued constructions for other claim terms at issue in this case. I will accept those interpretations as correct.

34.     In forming my opinions, I have relied on my understanding of the governing law on claim interpretation, which is reflected in the following cases: *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384-391 (1996); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1324 (Fed. Cir. 2005); *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1304-13 (Fed. Cir. 1999); *Cybor Corp. v. FAS Techs.*, 138 F.3d 1448 (Fed. Cir. 1998) (en banc); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977 (Fed. Cir. 1995) (en banc).

## C. LITERAL INFRINGEMENT

35.     There are two types of "direct infringement": (1) "literal infringement" and (2) "infringement under the doctrine of equivalents." To decide whether the accused's product literally infringes a claim of the '539 patent, one must compare that product with the patent claim and determine whether every requirement of the claim is included in that product. If so, the accused's product literally

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

INHOUSE CO. LAW FIRM

infringes that claim. If, however, the accused's product does not have every requirement in the patent claim, the accused's product does not literally infringe that claim. One must decide literal infringement for each asserted claim separately.

36.    If the patent claim uses the term "comprising," that patent claim is to be understood as an open claim. An open claim is infringed as long as every requirement in the claim is present in accused's product. The fact that accused's product also includes other parts will not avoid infringement, as long as it has every requirement in the patent claim.

37.    In forming my opinions, I have relied on my understanding of the governing law of literal infringement, which is reflected in the following cases: *MicroStrategy Inc. v. Business Objects, S.A*., 429 F.3d 1344, 1352-53 (Fed. Cir. 2005); *Netword, LLC v. Centraal Corp*., 242 F.3d 1347, 1353 (Fed. Cir. 2001); *Cole v. Kimberly-Clark Corp*., 102 F.3d 524, 532 (Fed. Cir. 1996); *Cross Med. Prods. v. Medtronic Sofamor Danek*, 424 F.3d 1293 (Fed. Cir. 2005); *BMC Res., Inc. v. Paymentech, L.P*., 498 F.3d 1373 (Fed. Cir. 2007).

### D. DOCTRINE OF EQUIVALENTS

38.    If one decides that the accused's product does not literally infringe an asserted patent claim, one must then decide whether that product infringes the asserted claim under what is called the "doctrine of equivalents."

39.    Under the doctrine of equivalents, the product infringes an asserted patent claim if it includes parts that are identical or equivalent to the requirements of the claim. If the product is missing an identical or equivalent part to even one requirement of the asserted patent claim, the product cannot infringe the claim under the doctrine of equivalents. Thus, in making a decision under the doctrine of equivalents, one must look at each individual requirement of the asserted patent claim and decide whether the product has either an identical or equivalent part to that individual claim requirement.

40.    A part of a product is equivalent to a requirement of an asserted claim if a person of ordinary skill in the field would think that the differences between the part and the requirement were not substantial as of the time of the alleged infringement.

41.    Changes in technique or improvements made possible by technology developed after the patent application is filed may still be equivalent for the purposes of the doctrine of equivalents if the part still meets the other requirements of the doctrine of equivalents set forth in this instruction.

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

INHOUSE CO. LAW FIRM

INHOUSE CO. LAW FIRM

### i.  The Function-Way-Result Test

42.     One way to decide whether any difference between a requirement of an asserted claim and a part of the product is not substantial is to consider whether, as of the time of the alleged infringement, the part of the product performed substantially the same function, in substantially the same way, to achieve substantially the same result as the requirement in the patent claim (the "function–way–result test").

### ii.  The Insubstantial-Difference Framework/Test

43.     In deciding whether any difference between a claim requirement and the product is not substantial, one may consider whether, at the time of the alleged infringement, persons of ordinary skill in the field would have known of the interchangeability of the part with the claimed requirement. The known interchangeability between the claim requirement and the part of the product is not necessary to find infringement under the doctrine of equivalents. However, known interchangeability may support a conclusion that the difference between the part in the product and the claim requirement is not substantial. The fact that a part of the product performs the same function as the claim requirement is not, by itself, sufficient to show known interchangeability.

44.     In forming my opinions, I have relied on my understanding of the governing law of Doctrine of Equivalents, which is reflected in the following cases: *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722 (2002); *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17 (1997); *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 609 (1950); *Abraxis Bioscience, Inc. v. Mayne Pharma* (USA) Inc., 467 F.3d 1370, 1379-82 (Fed. Cir. 2006*); Pfizer, Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1378 (Fed. Cir. 2005); *Johnston & Johnston Assoc. v. R.E. Service Co., 285 F.3d 1046* (Fed. Cir. 2002) (en banc); *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1480 (Fed. Cir. 1998); *Dolly, Inc. v. Spalding & Evenflo Cos.*, 16 F.3d 394, 397 (Fed. Cir. 1994).

### E.  A PERSON OF ORDINARY SKILL IN THE ART ("POSITA")

45.     The question of invalidity of a patent claim is determined from the perspective of a person of ordinary skill in the art in the field of the asserted invention as of the effective filing date of the patent. 35 U.S.C. § 103; *KSR Intern. Co. v. Teleflex, Inc.*, 550 U.S. 398, 421 (2007); *Graham v. John Deere Co.*, 383 U.S. 1, 3 (1966).

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

46.    In my opinion, a person of ordinary skill in the art ("POSITA") as of the effective filing date of the '539 Patent (February 6, 2021) would have held at least a bachelor's degree in mechanical engineering, industrial design, automotive engineering, or a related discipline, or possessed equivalent practical experience. Such a person would also have had approximately two to three years of experience in the design and development of automotive interior components or consumer accessories, including familiarity with molded plastic parts, expandable or adjustable mechanisms, and fastening systems commonly used in vehicle cupholders and adapters. A POSITA would have been capable of interpreting patent drawings and specifications, and would have understood the ergonomic and consumer-use considerations relevant to cupholder design.

## VII.    COURT'S CLAIM CONSTRUCTION

47.    I have reviewed the Court's Claim Construction Order (Doc. No. 44, June 25, 2025) regarding U.S. Patent No. 11,772,539. Consistent with my role as an expert, I accept the Court's constructions as controlling and have applied them in forming my opinions. The Court construed the following terms:

    a.  **"Cylindrical"** – construed to mean *"having the approximate form of a cylinder including variations in diameter along the length of the cylinder."*
    I interpret and apply this construction by treating cupholder bodies that generally exhibit a rounded, continuous profile with minor variations in diameter as satisfying this limitation.

    b.  **"Collar"** – construed to mean *"a circular lip device having two or more integrated cantilever structures extending towards the center portion of the lip."*
    I apply this construction by requiring that the collar itself be manufactured with integral, non-modular cantilever tabs as part of its structure, rather than merely holding or accommodating separate inserts.

    c.  **"Includes a plurality of tabs"** – construed to mean *"comprising two or more tabs."*
    I apply this construction by recognizing that at least two tabs must be present.

    d.  **"Adapter base"** – construed to mean *"an adapter configured to act as the base for the cupholder."*

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

INHOUSE CO. LAW FIRM

I apply this construction by treating the lower portion of a cupholder assembly that supports the cylindrical cupholder body as the adapter base.

e.  **"Attachment member"** – given its plain and ordinary meaning.

I apply this construction by identifying the structure portion of the cupholder body that enables coupling to the adapter base.

f.  **"A number of mounting holes"** / **"a number of protrusions"** – construed to mean *"at least one mounting hole"* and *"at least one protrusion."*

I apply this construction by recognizing that the claim is satisfied if the attachment member includes one or more mounting holes, and if there is at least one protrusion. In practice, this means that a single hole or a single protrusion is sufficient to meet the limitation, although additional holes or protrusions may also be present.

g.  **"Mounting holes"** – given its plain and ordinary meaning.

I apply this construction by identifying the recesses or holes in the attachment member— whether they are through-holes (physical openings) or negatives (indentations)—that are designed to receive a fastener or to align with a protrusion. In either form, these mounting holes enable the cupholder body to be coupled to the adapter base.

h.  **"The hole of the at least one protrusion of the number of protrusions"** – construed to mean *"an open fastening hole at the top of a protrusion."*

I apply this construction by requiring that the protrusion itself contain a fastening hole that can align with a mounting hole in the attachment member.

i.  **"Spacer"** – given its plain and ordinary meaning.

I apply this construction by treating a spacer as a discrete component positioned between the cupholder body and the adapter base, serving to separate or create distance between those structures. An adapter base, mechanically built into the product and functioning without an intervening component (a spacer) between itself and the cupholder body, does not meet this limitation.

j.  **Other terms** – including "legs," "diameter of the adapter base," "a fastener," "expand and retract via rotation of the cupholder," "aligned configuration," "off-set configuration," and "screw gear" – were adopted at their plain and ordinary meaning.

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

INHOUSE CO. LAW FIRM

I apply these terms according to their ordinary technical usage in the field of automotive accessories.

## VIII.   INFRINGEMENT / NON-INFRINGEMENT ANALYSIS

48.    I have been asked to apply the Court's claim constructions, as well as the claim term stipulations agreed upon by the Parties, to the Accused Products. Consistent with Federal Rule of Civil Procedure 26(a)(2)(B), my opinions are based on my review of the asserted patent, its prosecution history, the Court's claim construction order, the Parties' stipulations, and the technical information provided regarding the Accused Products. I understand that claim construction is a matter of law for the Court. Accordingly, I have not offered independent constructions of claim terms. Instead, I have applied the Court's constructions and stipulations to determine, from a technical perspective, whether the Accused Products meet the limitations of the asserted claims, either literally or under the doctrine of equivalents.

### A.  LITERAL INFRINGEMENT ANALYSIS OF INDEPENDENT CLAIM 1

#### i.   Cylindrical cupholder

49.    Claim 1 requires "a cylindrical cupholder having a hollow internal volume." Under the Court's construction, the Accused Product's body, although tapered and including a side cutout, still has the approximate form of a cylinder and encloses a hollow internal volume. Accordingly, this limitation is satisfied.

#### ii.   Collar with integrated tabs

50.    Claim 1 further requires "a collar attached to a top portion of the cylindrical cupholder, wherein the collar includes a plurality of tabs extending perpendicularly into the hollow internal volume." The Court construed "collar" to require integrated cantilever structures, and "plurality of tabs" to mean two or more tabs. In the '539 Patent, the tabs are depicted and described as molded into, and structurally part of, or monolithic to, the collar itself.

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**



51.    The Accused Product, by contrast, does not have integrated tabs, they are not monolithic to the collar. Instead, it employs separate, independently manufactured, modular tab inserts, with through holes, that are sandwiched and located with pins between components and can be removed, substituted or replaced by the manufacturer/assembler or by the end user.



52.    Because the Court's construction requires the collar itself to include integrated cantilever structures, matching the 539 patent's drawings and non-plural description of the collar in Figures 2 and 3 and the BRIEF DESCRIPTION OF THE SEVERAL VIEWS OF THE DRAWINGS, respectively, the Accused Product does not meet this limitation literally.

INHOUSE CO. LAW FIRM

53.     Moreover, the '539 patent expressly teaches that the "plurality of tabs includes tabs of different lengths and widths," a claimed structural-functional limitation that requires the collar to feature integrated and monolithic, variable-geometry cantilever tabs with different inward protrusion lengths that produce specific retention behavior across varying container sizes; the patent's detailed description clearly states that this variance in tab length allows some tabs, or a combination of tabs, to function in a particular, desirous way by remaining perpendicular to any nested drink container, thus providing different support than tabs that would otherwise be bent downward by insertion of drink containers having outside diameters greater than the interior diameter circumscribed by encircling tabs of otherwise uniform length.  This teaching ties the claimed tab geometry to concrete functions (stabilization of wide, tall, and narrow containers and retention via some tabs remaining in a perpendicular orientation to the resultant container loading), a particular way of carrying loads (unbent tabs in lateral compression, as opposed to separate tabs in bending and/or shear loading pushing against a separate hoop with tolerance stacking effects), and predictable results (stable retention under vibration and lateral acceleration of the vehicle beneath).  The claimed device's monolithic integration of these variable-length/width tabs also yields fixed scuff and thermal cycling and resultant service life, further distinguishing the claimed collar architecture from the Accused Product's separately manufactured, uniform length, removable tab inserts which create different load paths (including bending and shear loading), serviceability, tolerance behavior, and failure modes and are not equivalent without vitiating the patent's express structural limitation.

### iii.   Adapter base with expandable legs

54.     Claim 1 also requires "an adapter base coupled to the cylindrical cupholder, wherein the adapter base includes a plurality of legs configured to expand and retract such that the diameter of the adapter base is configured to expand from a minimum diameter to a maximum diameter." Under the Court's construction of "adapter base," the Accused Product does include a base with expandable legs. This limitation appears to be satisfied.

### iv.   Attachment member and fastener system

55.     Claim 1 further requires "an attachment member positioned on a bottom surface of the cylindrical cupholder, wherein the attachment member enables the coupling of the adapter base and the cylindrical cupholder," and specifies that the attachment member comprises mounting holes aligned

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

INHOUSE CO. LAW FIRM

with protrusions such that a fastener can extend through. The Court construed "a number of mounting holes" and "a number of protrusions" to mean "at least one mounting hole" and "at least one protrusion," and "the hole of the at least one protrusion" to mean "an open fastening hole at the top of a protrusion."



56.     Applying these constructions, the Accused Product's fastener interface satisfies the numerosity requirement so long as it provides one or more mounting holes and one or more protrusions with a fastening hole at the top that can be aligned to accept a fastener.



**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

INHOUSE CO. LAW FIRM

57.     On that basis, the Accused Product meets this element.

v. <u>Literal Infringement Analysis: Conclusion</u>

58.     Because the Accused Product does not include a collar with integrated cantilever tabs as required by the Court's construction of Claim 1, it cannot literally infringe Claim 1. This limitation is not met. Accordingly, the Accused Product does not literally meet all the limitation of Claim 1 of the '539 Patent.

**B. DOCTRINE OF EQUIVALENTS ANALYSIS OF "COLLAR WITH INTEGRATED TABS" LIMITATION OF CLAIM 1**

59.     To a reasonable degree of engineering certainty, the accused architecture with separately formed, uniform length, replaceable tab modules attached via a pin-and-through-hole fastening system to a collar is not equivalent to a collar having tabs integrated into (formed monolithically as part of) the collar body. Applying the function–way–result test confirms substantial differences. The two designs (1) serve different functions at the claim-element level, (2) operate in a materially different way with distinct load paths, interfaces, and tolerance behavior, and (3) yield measurably different results in serviceability, durability, positional accuracy, and failure modes.

i. <u>Function</u>

60.     The claimed design requires tabs that are formed as part of the collar itself, creating a single, monolithic structure. The function of this element is to provide tab geometry as an intrinsic feature of the collar body so that the collar and tabs act as a single continuous member. This ensures fixed alignment, continuous hoop stiffness, and precludes field substitution that could alter performance.

61.     The Accused Product, by contrast, employs non-integrated rubber inserts that are separately manufactured and sandwiched between a rigid plastic lip and the cupholder body. The function of these inserts is not to form part of the collar body, but to provide modularity and serviceability—allowing users to install, remove, or exchange inserts of different shapes, lengths, or stiffness. Thus, the claimed function of structural monolithicity is absent, and the accused function of modularity is different in kind, not merely in degree.

62.     This is not a trivial variation but a deliberate design choice: it allows the manufacturer and user to exchange tab inserts of different shapes, lengths, stiffness and materials, or to remove the inserts entirely if desired, and to replace worn inserts without replacing the entire collar.

- 21 -

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

INHOUSE CO. LAW FIRM

INHOUSE CO. LAW FIRM

ii.    Way

63.    In the claimed design, loads such as radial retention, insertion/extraction forces, and torque are carried through a continuous hoop with no interfaces. Stress is distributed uniformly through the collar's uninterrupted cross-section, with predictable stiffness, a single tolerance stack, and uniform thermal expansion. In the accused design, loads are partitioned and transferred across mechanical, pin and through-hole joints. Stress passes through fastener clearances, adhesive layers, or snap-fit lands, introducing joint compliance, stress concentrations, and multi-stack tolerances. Collar and tab may even have different coefficients of thermal expansion and forced vibration damping, leading to varying performance under thermal or vibrational cycling. The "way" of achieving tab engagement is therefore materially different: one relies on a continuous monolithic hoop, the other on an interface-mediated assembly with manifold variables.

iii.    Result

64.    The integrated design yields stable retention force over vibration and thermal cycles, low positional variance, and predictable failure modes at the tab root. It does not permit field modularity. The patented design provides a single, permanent configuration with fixed performance characteristics. The accused design yields different and measurable results: serviceability (field replacement of tabs), configurability (interchangeable geometries altering retention profiles), potentially greater retention decay over time due to joint relaxation, higher positional variance, and distinct failure modes such as fastener loosening or adhesive creep not found in the patented design. These are not insubstantial differences; they change the consumer experience, product life, and introduce performance variability. Consumers can customize the grip to fit different containers, enjoy the option to remove or replace tabs, and extend the product's useful life by swapping out, worn inserts.

iv.    Insubstantial-Differences Analysis

65.    Even apart from the function–way–result framework, the differences between the claimed integrated-tab design and the accused replaceable-insert design are substantial, not insubstantial. Under the insubstantial-differences test, the question is whether the Accused Product is "substantially different" from what is claimed, from the perspective of a person of ordinary skill in the art. The test is designed to prevent competitors from avoiding infringement through trivial modifications, while still requiring an element-by-element analysis to ensure that meaningful structural

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

and functional distinctions are respected. Here, the accused design introduces new capabilities—field serviceability, configurability, and modular replacement—that the claimed design expressly excludes by requiring integration. These are not cosmetic or incidental changes; they alter how the product is manufactured, maintained, and experienced by consumers. A person of ordinary skill in the art would understand that the accused design reflects a different engineering choice with different trade-offs in durability, tolerance behavior, and failure modes. Because these differences materially affect performance, lifecycle, and user experience, they cannot be dismissed as insubstantial variations of the claimed structure.

v.  <u>Doctrine of Equivalents: Conclusion</u>

66.    While both designs ultimately stabilize a container, they do so with different functions, in different ways, and with different results. Treating separately formed, removable, sandwiched inserts as equivalent to integrated molded tabs would vitiate the Court's construction of "integrated" and erase a key limitation. A person of ordinary skill in the art would recognize that the accused design reflects a different engineering choice, not an interchangeable substitute. Accordingly, the accused non-integrated, replaceable-tab architecture is not equivalent to a collar with tabs integrated into the collar body under either the function–way–result test or the insubstantial-differences framework.

**C.  CONCLUSION AS TO INFRINGEMENT / NON-INFRINGEMENT ANALSYSIS**

67.    While the Accused Product may satisfy certain limitations of claim 1, it does not meet the requirement of a collar with integrated cantilever tabs. This is not a minor difference but a fundamental structural distinction. Nor can it be bridged under the doctrine of equivalents without vitiating the Court's construction. For these reasons, it is my opinion that the Accused Product does not meet all the limitations of claim 1 of the '539 Patent, either literally or under the doctrine of equivalents. Because claim 1 is not met, none of the limitations of the dependent claims (claims 2–7) can be met, as each incorporates all of the limitations of claim 1.

**IX.  <u>APPLICABLE LEGAL PRINCIPLES FOR VALIDITY / INVALIDITY ANALYSIS</u>**

68.    I have been informed by counsel that in order for someone to be entitled to a patent, the invention must actually be "new" and not obvious over what came before, which is referred to as the prior art. Prior art is considered in determining whether claim(s) of the patent are anticipated or obvious. Prior art may include items that were publicly known or that have been used or offered for sale, or

references, such as publications or patents, that disclose the claimed invention or elements of the claimed invention. 35 U.S.C. § 102(a)(1)-(2); 35 U.S.C. § 102(b)(1)-(2).

### A. INVALIDITY—ANTICIPATION

69.    Anticipation must be determined on a claim-by-claim basis. Accused must prove by clear and convincing evidence that all of the requirements of a claim are present in a single piece of prior art. To anticipate the invention, the prior art does not have to use the same words as the claim, but all of the requirements of the claim must have been disclosed and arranged as in the claim. The claim requirements may either be disclosed expressly or inherently—that is, necessarily implied—such that a POSITA in the technology of the invention, looking at that one reference, could make and use the claimed invention.

70.    If a dependent claim is anticipated by the prior art, then the claims from which it depends are necessarily anticipated as well.

71.    In forming my opinions, I have relied on my understanding of the governing law of anticipation, which is reflected 35 U.S.C. § 102 and in the following cases: *Monsanto Tech. LLC v. E.I. DuPont de Nemours & Co.*, 878 F.3d 1336, 1343 (Fed. Cir. 2018); *Finisar Corp. v. DirectV Grp., Inc.*, 523 F.3d 1323, 1334 (Fed. Cir. 2008); *Net MoneyIN, Inc. v. Verisign, Inc.*, 545 F.3d 1359, 1369-70 (Fed. Cir. 2008).

### B. INVALIDITY—OBVIOUSNESS

72.    Not all innovations are patentable. A patent claim is invalid if the claimed invention would have been obvious to a POSITA as of the effective filing date of the claimed invention. In deciding the level of ordinary skill, one should consider all of the evidence, including: (1) the levels of education and experience of persons working in the field; (2) the types of problems encountered in the field; and (3) the sophistication of the technology.

73.    A reference is reasonably related if it is in the same field as the claimed invention or is from another field to which a person of ordinary skill in the field would look to solve a known problem.

74.    One must decide what difference, if any, existed between the claimed invention and the prior art.

75.    I have also considered whether there is any evidence of objective indicia of non-obviousness, sometimes referred to as "secondary considerations." These include: (1) commercial

- 24 -

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

INHOUSE CO. LAW FIRM

success of a product due to the merits of the claimed invention; (2) a long-felt but unsolved need addressed by the claimed invention; (3) unsuccessful attempts by others to solve the same problem; (4) copying of the claimed invention by others; (5) unexpected or superior results attributable to the claimed invention; (6) industry praise or licensing of the claimed invention; (7) other evidence tending to show non-obviousness; (8) independent invention of the claimed invention by others at or about the same time; and (9) other evidence tending to show obviousness. 35 U.S.C. § 103; *Graham v. John Deere Co.*, 383 U.S. 1 (1966); *KSR Intern. Co. v. Teleflex, Inc.*, 550 U.S. 398, 407 (2007); *Circuit Check v. QXQ Inc.*, 795 F.3d 1331, 1335 (Fed. Cir. 2015); *Ruiz v. A.B. Chance Co.*, 234 F.3d 654 (Fed. Cir. 2000); *Arkie Lures, Inc. v. Gene Larew Tackle, Inc.*, 119 F.3d 953, 957 (Fed. Cir. 1997); *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 991 (Fed. Cir. 1988); *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1000 (Fed. Cir. 1986); *Pentec. Inc. v. Graphic Controls Corp.*, 776 F.2d 309, 313 (Fed. Cir. 1985). See *Novo Nordisk A/S v. Becton Dickinson & Co.*, 304 F.3d 1216, 1219-20 (Fed. Cir. 2002); *Wang Labs. v. Toshiba Corp.*, 993 F.2d 858, 864 (Fed. Cir. 1993); *Daiichi Sankyo Co. v. Apotex, Inc.*, 501 F.3d. 1254, 1256 (Fed. Cir. 2007); *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1125 (Fed. Cir. 2000); *SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1355 (Fed. Cir. 2000); *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718-19 (Fed. Cir. 1991).

76.    At this time, I have not been presented with any evidence relating to these secondary considerations. Accordingly, my opinions regarding obviousness are based on the prior art, the level of ordinary skill in the art, and the differences between the asserted claims and the prior art, as set forth above. Should evidence of secondary considerations be introduced, I reserve the right to supplement my opinions to address such evidence.

## X.    VALIDITY / INVALIDITY ANALYSIS

### A.  VALIDITY / INVALIDITY ANALYSIS: INDEPENDENT CLAIM 1

77.    For ease of reference, I have prepared an invalidity chart (**Exhibit 10**) that maps each limitation of the asserted claims of the '539 Patent to the disclosures in the prior art. My narrative analysis below corresponds to and expands upon that chart.

78.    I understand that the effective priority date of the '539 Patent is February 6, 2021. The Expander Product was publicly available and on sale as of March 13, 2019, as verified by Amazon

INHOUSE CO. LAW FIRM

records. Because this date is more than two years before the priority date, the Expander Product qualifies as prior art under 35 U.S.C. §§ 102 and 103.

79.      I have applied the Court's claim construction order (Doc. No. 44) in forming these opinions and applied these constructions in the analysis below.

        i.    <u>Cylindrical cupholder with hollow internal volume.</u>

80.      The Court construed "cylindrical" to mean "[h]aving the approximate form of a cylinder including variations in diameter along the length of the cylinder." (Doc. No. 44)

81.      The Car Cup Holder Expander, sold on Amazon.com under ASIN B07PMHPJJF, was publicly available prior to the priority date of the '539 patent. For clarity, I refer to the Car Cup Holder Expander sold on Amazon under ASIN B07PMHPJJF as the "Expander Product." According to Amazon's product listing, as documented in contemporaneous printouts, the product was first available in March 13, 2019. (*see Exhibit 3; Amazon.com product page for ASIN B07PMHPJJF, "Date First Available: March 13, 2019"*). I obtained a physical unit of the Expander Product prior to preparing this report, which I reviewed in forming my opinions.

82.      The product includes a cylindrical cupholder body with a hollow internal volume, an expandable base designed to fit different vehicle cupholders, and inward-extending, rubber tabs integrated around the collar to stabilize containers. It also provides a slot to accommodate mugs with handles and supports larger beverage containers.



83.      In addition to these features, the product further includes three mounting holes at the bottom of the cupholder body and the adapter base has three corresponding protrusions. Three screws pass through the mounting holes and into the protrusions of the adapter base to fix the cupholder body

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

INHOUSE CO. LAW FIRM

and the adapter base together. These features demonstrate that expandable bases, collar-mountedretention tabs, modular stabilization structures, and screw-mounted coupling between the cupholder body and adapter base were known and implemented in practice before the asserted patent.



84.     The Expander Product discloses a cupholder body molded in the approximate form of a cylinder, with tapering (variation) in diameter along its length to facilitate insertion of beverage containers. The body encloses a hollow internal cavity for receiving containers. *See Exhibit 3 (printout at "About this item" stating "FIT MOST 32 OUNCE – 40 OUNCE WIDE BOTTLES AND DIAMETER 3.4"-3.8") and product image showing cylindrical body with hollow cavity).* This meets the Court's construction of "cylindrical."Accordingly, the Expander Product anticipates this limitation of claim 1.

85.     U.S. Patent 4,854,468 (Dahlquist, II), filed April 14, 1987, claims a cupholder body shaped in the form of a cylinder tapering (variation) in diameter along its length to facilitate insertion of beverage containers. *See **Exhibit 4**; U.S. Patent 4,854,468, issued August 8, 1989 ("Dahlquist, II" or*

"the '468 Patent"). As shown in Figure 1 of the '468 Patent (reproduced below), the body encloses a hollow internal cavity for receiving containers. Claim 10 of the '468 Patent recites "…support cone having a top rim and smaller base rim…" (col. 6, ll. 39–40). Accordingly, Patent '468 Patent anticipates this limitation of Claim 1.



### ii. Collar with integrated tabs

86.    The Court construed "collar" to mean "[a] circular lip device having two or more integrated cantilever structures extending towards the center portion of the lip," and "include a plurality of tabs" to mean "[c]omprising two or more tabs." The Expander Product includes a collar at the top rim of the cupholder with multiple inwardly extending rubber tabs. These tabs are molded as part of the collar and extend into the hollow volume to grip bottles. See Exhibit 3, printout at "About this item" ('rubber tabs around the top of the cup holder hold the cup firmly in place without tipping or spilling').

This matches the Court's construction of "collar" and "plurality of tabs." This matches the Court's construction directly. Accordingly, the Expander Product anticipates this limitation of Claim 1.

 

87.    U.S. Patent 11,254,253 B1 (Fan), filed Jan. 6, 2021, claims a circular device with integrated cantilever structures extending towards the center portion of the lip.  *See **Exhibit 5**; U.S. Patent No. 11,254,253 B1, issued February 22, 2022* ("Fan" or "the '253 Patent"). Claim 9 of the '253 Patent recites "… wherein the outer wall of the top of the base unit comprises a pivotal circular wall, and the pivotal circular wall comprises a plurality of longitudinal protruding teeth." (col. 8, ll. 27–30). As shown in Figure 1 of the '253 Patent (reproduced below), these tabs are molded as part of the collar and extend into the hollow volume to grip bottles. This also matches the Court's construction directly. Accordingly, the '253 Patent anticipates this limitation of Claim 1.



Tabs molded as part of the collar

FIG. 1

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

1

2

iii.   Adapter to Act As the Base for the Cupholder

88.    The Court construed "adapter base" as "[a]n adapter configured to act as the base for the cupholder." The Expander Product discloses an adapter base with multiple segmented legs that expand and retract by rotation. *See Exhibit 3 (printout at "About this item" stating "EXPANDABLE BASE FOR DIAMETER 2.5"–3.75"CAR CENTRE CONSOLE CUP" and product image showing segmented legs extended)*. Focusing specifically on the nature of this item, it is clearly an adapter, the role of which is to act as the base for the cupholder affixed to, and above, it. This limitation is therefore at least obvious in view of the Expander Product.

89.    U.S. Patent 5,655,742 (Whitman), filed April 12, 1995, claims an adapter base for the cupholder.  *See **Exhibit 6**; U.S. Patent 5,655,742, issued August 12, 1997* ("Whitman" or "the '742 Patent"). Claim 1 of the '742 Patent recites "a cylindrically shaped base having an upper mounting surface…" (col. 5, ll. 1-2). The cupholder body mounts directly to this base, as shown in figures 1 and 2 of the '742 Patent (reproduced below).  This also matches the Court's construction directly. Accordingly, the '742 Patent anticipates this limitation of Claim 1.



**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

INHOUSE CO. LAW FIRM

iv.  <u>Attachment Member on Bottom Surface</u>

90.     The Court gave "attachment member" its plain and ordinary meaning. The Expander Product includes an attachment structure, or member, on the bottom (underside) of the cupholder body that fixes the cupholder body to the base.



This structure enables the coupling of the two components. Even if the precise geometry differs from the '539 Patent, a POSITA would have recognized that providing an attachment member on the bottom surface is a standard way to connect a cupholder body to a base. This limitation would have been obvious.

91.     The '742 Patent (Whitman) claims a cupholder with an attachment member on its bottom surface. See Exhibit 6, Figure 4 (reproduced below). Claim 1 of the '742 Patent recites "said opening is further provided with a first coupling means to couple said base to a body…" (col. 5, ll. 5-7).  This coupling attachment member, labeled 40 in Figure 4, takes the form of a protruding shaft with an upper lip that interlocks with a planar ring in the base below the cupholder, mounting the cupholder securely to the base. This also matches the Court's construction directly. Accordingly, the '742 Patent anticipates this limitation of Claim 1.

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

INHOUSE CO. LAW FIRM



v.   <u>Mounting Holes, Protrusions, and Fasteners</u>

92.    The Court construed "a number of mounting holes" and "a number of protrusions" to mean "[a]t least one mounting hole" and "[a]t least one protrusion." and "the hole of the at least one protrusion of the number of protrusions" to mean "[a]n open fastening hole at the top of a protrusion."The Court further construed "mounting holes" to have its plain and ordinary meaning. The Expander Product discloses these structures in detail:

a.  **Mounting holes:** The attachment member at the bottom (underside) of the cupholder body includes three distinct mounting holes. Because the claim requires only "at least one," the disclosure of three falls squarely within the scope of the Court's construction.



**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

b. **Protrusions:** The adapter base includes three protrusions, each corresponding to a mounting hole. Again, because the claim requires only "at least one protrusion," the disclosure of three is fully encompassed.



c. **Holes in protrusions:** Each protrusion contains an open fastening hole located at its top. This matches the Court's construction of "the hole of the at least one protrusion."

d. **Alignment:** The design of the Expander Product requires that the mounting holes of the attachment member align with the holes in the protrusions. This alignment enables the fastening mechanism to function as intended.

e. **Fastener(s):** the Expander Product uses three screws that extend through the three mounting holes into the three protrusion holes. The claim requires only "a fastener," which under the Court's construction encompasses one or more. The presence of three screws necessarily includes at least one screw, and therefore falls within the scope of the claim. The use of multiple screws does not exclude the claim but rather exemplifies a common fastening approach in the art.



vi.   Conclusion as to Validity / Invalidity Analysis of Claim 1

93.     Based on the foregoing analysis, it is my opinion that Claim 1 of U.S. Patent No. 11,772,539 is anticipated under 35 U.S.C. §102 by the Expander Product. As shown, each limitation of Claim 1 is disclosed in the prior art, either explicitly or inherently. Accordingly, Claim 1 lacks novelty and is unpatentable.

**B.  VALIDITY / INVALIDITY ANALYSIS ON DEPENDENT CLAIMS 2: EXPANDABLE AND RETRACTABLE LEGS VIA ROTATION OF CUPHOLDER**

94.     Each dependent claim must be analyzed separately. I apply the Court's constructions for '539 Patent. Dependent claims incorporate all limitations of claim 1 and add the limitations recited in Claims 2–7.

95.     Claim 2 depends from Claim 1 and requires that "the plurality of legs are configured to expand and retract via rotation of the cupholder." The Court construed this limitation to mean that the expansion and retraction of the adapter base legs must be actuated by rotating the cupholder body.

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

i. <u>Prior Art Discloses Plurality of Legs Configured to Expand and Retract Via Rotation of the Cupholder</u>

96.    The Expander Product expressly discloses this feature. The product photo show segmented legs at the base that expand outward when the upper cupholder body is rotated. This is the same mechanism described in the '539 Patent: rotation of the cylindrical cupholder causes the threaded or geared interface to drive the legs outward or inward, thereby adjusting the base diameter.



97.    Even if the precise internal gearing differs from the '539 Patent's embodiment, the Expander Product achieves the same function (expansion/retraction), in the same way (rotation of the cupholder body), to achieve the same result (adjusting the base diameter to fit different OEM cupholders). As shown, each limitation of Claim 2 is disclosed in the prior art, either explicitly or inherently. Accordingly, Claim 2 of U.S. Patent No. 11,772,539 is anticipated under 35 U.S.C. §102 by the Expander Product and thus lacks novelty and is unpatentable.

98.    Additionally, Patent No. 9,220,349 ("Cashin"), filed March 19, 2015, discloses a cupholder adapter that is secured or released by rotating the cupholder, which causes the pivoting arms to adjust via a clamping mechanism. *See **Exhibit 7**; U.S. Patent No. 9,220,349, issued Dec. 29, 2015* ("Cashin" or "the '349 Patent").

99.    As shown in figures 1 and 8 of the '349 patent (reproduced below), the adapter includes a base with multiple mounting holes, a cylindrical cupholder body with an integral adjustment screw, and a clamping mechanism comprising pivoting arms actuated by a threaded drive hub. The design allows the adapter to be secured or released by rotating the cupholder, and it can support both beverage containers and accessory devices such as closed-captioning displays. Cashin demonstrates that

INHOUSE CO. LAW FIRM

expandable clamping mechanisms, screw-actuated drive hubs, and integrated cylindrical cupholder

structures were known in the art prior to the asserted patent.



FIG 1

FIG 8

100.    Moreover, Fan (U.S. Patent No. 11,254,253 B1) also discloses expandable units actuated

by rotation of the cupholder. Specifically, each expansion unit includes a moving part and a wall support,

with guide blocks that engage the spiral groove such that rotation of the unit causes the expansion

members to extend outward through corresponding through holes in the base. Rotating unit of Fan's

carrying bracket includes a spiral guide groove that interfaces with guide blocks on each expansion unit.

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

INHOUSE CO. LAW FIRM

As shown in figure 2 of the '253 Patent (reproduced below), when the upper cupholder is rotated, the guide blocks travel along the spiral groove, causing the expansion units in the base to move linearly outward through corresponding through-holes in the base. As shown in figure 4 and 6 of the '253 Patent (reproduced below), this mechanism enables the bracket to press securely against the inner wall of a vehicle's cupholder, thereby achieving adjustable fixation through rotation.



FIG. 2

FIG. 4

FIG. 6

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

ii.   Motivation to Include and Combine this Feature

101.    A POSITA would have been motivated to configure expandable legs to actuate via rotation of the cupholder body for routine, predictable reasons. The Expander Product (ASIN B07PMHPJJF) already discloses expandable legs that adjust through rotation of the cupholder, satisfying this limitation.

102.    Fan (U.S. Patent No. 11,254,253) further confirms that rotational actuation of expansion units using spiral grooves is a well-understood mechanism in vehicle cupholder accessories. *See Exhibit 5.* Cashin (U.S. Patent No. 9,220,349) also teaches a rotational interface between the cupholder and base, where rotation causes pivoting arms to adjust through a clamping mechanism. *See Exhibit 7.* A POSITA would have recognized that these mechanisms instructions - are ergonomically intuitive, requiring no tools, and are standard in consumer-grade adjustable fixtures where they are often labeled, "twist to tighten." Moreover, rotational actuation ensures secure fitment across a wide range of OEM cupholder diameters without redesigning the base for every car's cupholder aperture dimension, thereby reducing manufacturing and distribution complexity by integrating the adjustment mechanism into the body of the base itself. These factors would have provided strong motivation to adopt and refine rotational expansion designs, and reinforce that the claimed feature was not only known, but expected in the field.

iii.   Conclusion as to Validity / Invalidity Analysis of Claim 2

103.    Claim 2 is anticipated under 35 U.S.C. §102 by the Expander Product (ASIN B07PMHPJJF), which discloses expandable legs configured to actuate via rotation of the cupholder body. *See Exhibit 3.* This mechanism is present in the commercial product and satisfies the limitation of Claim 2. Accordingly, Claim 2 is not novel. Even if the Court were to conclude that the Expander Product does not literally disclose every detail of the expansion mechanism, Claim 2 is nonetheless obvious under 35 U.S.C. §103. A POSITA would have found it obvious to configure expandable legs to actuate by rotation of the cupholder body in view of the Expander Product, further in view of Fan (U.S. Patent No. 11,254,253), which teaches spiral groove-based rotational expansion, and further in view of Cashin (U.S. Patent No. 9,220,349), which teaches rotational clamping mechanisms for cupholder adapters. *See Exhibits 5, 7.* Each reference independently reinforces the ergonomic, mechanical, manufacturing and distributional advantages of rotational actuation. Therefore, Claim 2 is anticipated

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

INHOUSE CO. LAW FIRM

under §102 and, in the alternative, is rendered obvious under §103 in view of the Expander Product alone or in combination with Fan and/or Cashin.

## C. VALIDITY / INVALIDITY ANALYSIS ON DEPENDENT CLAIM 3: ALIGNED AND NOT ALIGNED AXIS

104.    Claim 3 depends from Claim 1 and requires that the cylindrical cupholder be configured to be coupled to the adapter base in a variety of configurations, including at least: (a) the cylindrical cupholder's axis aligned with the adapter base's axis; and (b) the cylindrical cupholder's axis not aligned with the adapter base's axis. The Court construed this to require both concentric (aligned) and off-set (not aligned) orientations between the cupholder and the adapter base.

i.    Prior Art Discloses Aligned and Not Aligned Axis

105.    The Expander Product discloses a cupholder adapter with a upholder body and base mounted concentrically. Additionally, Cashin discloses a cup holder adapter designed to be mounted within an existing cup holder with a base (12) and cupholder body (24) mounted concentrically. *See Exhibit 4, U.S. Patent No. 9,220,349, date issued Dec. 29, 2015*. Both the Expander Product and Cashin satisfy the "aligned" configuration. *See Exhibit 3 and 7*. A POSITA would recognize this as the standard concentric attachment.

106.    Additionally, Fan discloses a modular base unit and rotating unit with a spiral guide groove and interchangeable accessories. While Fan does not use the term "off-set," its modular accessory mounting inherently allows alternate orientations, including off-set, depending on how the accessory is attached. A POSITA would understand Fan to teach the functional outcome of multiple coupling orientations.

107.    Pre-priority commercial adapters expressly disclose off-set mounting. Specifically, CARSA Cupholder discloses a rotatable upper adapter that laterally shifts the secondary cupholder relative to the base, clearing console lids and obstructions. *See **Exhibit 8**; Amazon.com product page for ASIN B08H86W469, "Date First Available: Sept. 2, 2020"* ("CARSA Cupholder"). The product includes a cylindrical cupholder body with a hollow internal volume, a rotatable adapter that can swivel 360° to reposition a secondary cupholder, and expandable brackets designed to accommodate bottles and mugs of varying diameters. The product also provides a slot to accommodate mugs with handles and functions as a storage compartment for small items such as phones, glasses, or keys. These features

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

demonstrate that multi-cup adapters, rotatable bases, expandable retention structures, and modular

stabilization mechanisms were known and implemented in practice before the asserted patent.



108.    Additionally, Automaze Cupholder discloses a Similar 360° rotatable adapter enabling

lateral off-set of the secondary cupholder relative to the base. *See Exhibit 9; Amazon.in product page for*

*ASIN B084GTHNWC, "Date First Available: Feb. 2020"* ("Automaze Cupholder"). the product

includes a cylindrical cupholder body with a hollow internal volume, an expandable base designed to fit

different vehicle cupholders, and a rotatable adapter that allows a secondary cupholder to be

repositioned. The product also provides adjustable brackets to accommodate bottles and mugs of varying

diameters, as well as a slot to accommodate mugs with handles. These features demonstrate that

expandable bases, rotatable adapters, and modular stabilization structures were known and implemented

in practice before the asserted patent.

109.

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**



INHOUSE CO. LAW FIRM

110.    Cashin, Fan, the CARSA Cupholder, and the Automaze Cupholder directly disclose the "not aligned" configuration required by Claim 3 and demonstrate widespread, pre-priority use of off-set orientations. *See Exhibits 5, 7-9.*

ii.    Motivation to Include Aligned and Not Aligned Configuration

111.    Claim 3 is rendered obvious under 35 U.S.C. §103. The Expander Product (ASIN B07PMHPJJF) discloses all elements of Claim 1 and serves as a primary reference. However, it does not disclose the specific limitation of Claim 3 — namely, that the cylindrical cupholder is configured to be coupled to the adapter base in both aligned and off-set configurations. This limitation is disclosed in multiple prior art references, including Fan (U.S. Patent No. 11,254,253), Cashin (U.S. Patent No. 9,220,349), Automaze (ASIN B084GTHNWC), and CARSA (ASIN B08H86W469), each of which teaches mechanisms for adjusting the orientation of a cupholder relative to its base. *See Exhibits 5, 7-9.*

112.    A person of ordinary skill in the art ("POSITA") would have been motivated to combine the Expander Product with any of these references for routine, predictable reasons: (i) enabling both aligned and off-set configurations improves compatibility with varied vehicle interiors and console layouts; (ii) such adjustability enhances user ergonomics and accessibility; (iii) the mechanical means for achieving alignment or off-set — such as indexed rotation, multiple mounting holes, or pivoting interfaces — were well-known and commercially viable at the time; and (iv) integrating this feature does not alter the fundamental operation of the Expander Product, but rather extends its utility in a

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

manner consistent with consumer expectations. Accordingly, Claim 3 is obvious in view of the Expander Product in combination with Fan, Cashin, Automaze, and/or CARSA. *See Exhibits 3, 5, 7-9.*

### iii.    Conclusion as to Validity / Invalidity Analysis of Claim 3

113.    Claim 3 is not anticipated under 35 U.S.C. §102 because the Expander Product does not disclose the limitation requiring both aligned and off-set coupling configurations. However, Claim 3 is nonetheless obvious under 35 U.S.C. §103. The Expander Product serves as a primary reference disclosing all other limitations of Claim 1. The "aligned and not aligned" coupling configurations of Claim 3 are taught in multiple prior art references: Fan (U.S. Patent No. 11,254,253) teaches modular, reconfigurable attachment systems; Cashin (U.S. Patent No. 9,220,349) provides aligned mounting; and Automaze (ASIN B084GTHNWC) and CARSA (ASIN B08H86W469) disclose off-set mounting configurations. Each reference independently supports the practical and ergonomic benefits of orientation flexibility. A POSITA would have found it obvious to incorporate these features into the Expander Product using well-known mechanical means such as indexed rotation or multiple mounting holes. Therefore, Claim 3 is obvious under §103 in view of the Expander Product in combination with Fan, Cashin, Automaze, and/or CARSA. *See Exhibits 3, 5, 7-9.*

## D.    VALIDITY / INVALIDITY ANALYSIS ON DEPENDENT CLAIM 4: MOUNTING HOLES OF ATTACHMENT MEMBER ENABLE MULTIPLE CONFIGURATIONS

114.    Claim 4 depends from Claim 1 and requires that "the number of mounting holes of the attachment member enable multiple configurations of the cylindrical cupholder in relation to the adapter base including an aligned configuration and off-set configuration." This limitation focuses not just on the ability to reposition the cupholder, but on the structural means — specifically, mounting holes — that enable such flexibility.

### i.    Prior Art Discloses Mounting Holes Of the Attachment Member Enabling Multiple Configurations

115.    Fan (U.S. Patent No. 11,254,253) discloses a modular base unit and rotating unit with a spiral guide groove and interchangeable accessories. While Fan does not use the term "mounting holes," its modular attachment system inherently allows the user to reposition accessories in alternate orientations, including off-set, depending on how the components are coupled. A POSITA would

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

understand Fan to teach the functional outcome of multiple coupling configurations enabled by structural features such as indexed grooves, guide blocks, and modular interfaces — all of which serve the same purpose as mounting holes in facilitating aligned and off-set attachment. See Exhibit 5.

116. Pre-priority commercial adapters expressly disclose off-set mounting enabled by structural attachment features. Specifically, the CARSA Cupholder (ASIN B08H86W469) includes a rotatable upper adapter that laterally shifts the secondary cupholder relative to the base, clearing console lids and obstructions. The product achieves this through a combination of indexed rotation and modular attachment points, which allow the cupholder to be secured in multiple orientations. These attachment features functionally correspond to mounting holes and demonstrate that multi-position coupling — including off-set — was implemented in practice before the asserted patent. *See Exhibit 8 (Amazon.com product page, "Date First Available: Sept. 2, 2020").*

117. Similarly, the Automaze Cupholder (ASIN B084GTHNWC) discloses a 360° rotatable adapter enabling lateral off-set of the secondary cupholder relative to the base. The product includes a cylindrical cupholder body, an expandable base, and a rotatable adapter that allows the cupholder to be repositioned and secured in different orientations. The attachment mechanism relies on modular interfaces and indexed positions that serve the same function as mounting holes — enabling multiple configurations of the cupholder relative to the base, including aligned and off-set. These features were known and commercially available prior to the asserted patent. *See **Exhibit 9** (Amazon.in product page, "Date First Available: Feb. 2020").*

ii. Motivation to include and Combine Multiple hole-based configurations

118. The Expander Product (ASIN B07PMHPJJF) discloses a cylindrical cupholder, an adapter base, and an attachment member with multiple mounting holes and protrusions. See Exhibit 3. While it does not expressly disclose both aligned and off-set configurations, it provides the structural framework for modular attachment using hole-and-tab interfaces. The limitation of Claim 4 is satisfied when the Expander Product is considered in view of prior art references that teach off-set mounting enabled by structural attachment features.

119. Fan (U.S. Patent No. 11,254,253) discloses a modular base unit and rotating unit with a spiral guide groove and interchangeable accessories. See Exhibit 5. While Fan does not use the term "off-set," its modular attachment system inherently allows alternate orientations depending on how the

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

accessory is coupled. A POSITA would understand Fan to teach the functional outcome of multiple coupling configurations enabled by structural features analogous to mounting holes.

120.    Commercial products such as the CARSA Cupholder (ASIN B08H86W469) and Automaze Cupholder (ASIN B084GTHNWC) expressly disclose off-set mounting enabled by rotatable adapters and modular interfaces. See Exhibit 8. These products include cylindrical cupholder bodies, expandable bases, and attachment mechanisms that allow the cupholder to be secured in different orientations. Although they do not use the term "mounting holes," their indexed rotation and modular coupling features serve the same function — enabling multiple configurations of the cupholder relative to the base, including aligned and off-set.

121.    A POSITA would have been motivated to provide multiple mounting holes for routine, predictable reasons:

- To allow the same cupholder body to be mounted in different orientations without redesigning the base.
- To provide clearance for console lids, shifter handles or obstructions by shifting the cupholder laterally.
- To give users flexibility in positioning for ergonomics and convenience.
- To reduce costs by enabling modularity and interchangeability through simple hole patterns.

122.    Therefore, Claim 4 is obvious under 35 U.S.C. §103 in view of the Expander Product in combination with Fan, CARSA, and/or Automaze. See Exhibits 3, 5, 8, 9. The claimed use of mounting holes to enable multiple configurations reflects well-understood design principles and does not confer patentable distinction over the prior art.

iii.    Conclusion as to Validity / Invalidity Analysis of Claim 4

123.    Claim 4 is not anticipated under 35 U.S.C. §102 because the Expander Product does not expressly disclose that the mounting holes of the attachment member enable multiple configurations, including aligned and off-set orientations. However, Claim 4 is nonetheless obvious under 35 U.S.C. §103. The Expander Product serves as a primary reference disclosing all other limitations of Claim 1 and includes a multi-hole attachment interface. *See Exhibit 3.* Fan (U.S. Patent No. 11,254,253) teaches modular, reconfigurable attachment systems; CARSA (ASIN B08H86W469) and Automaze (ASIN

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

INHOUSE CO. LAW FIRM

B084GTHNWC) both disclose off-set mounting enabled by rotatable adapters and modular interfaces. A POSITA would have been motivated to incorporate multiple mounting holes to enable flexible orientation for ergonomic, spatial, and manufacturing reasons. *See Exhibits 5, 8, 9.* Therefore, Claim 4 is obvious under §103 in view of the Expander Product in combination with Fan, CARSA, and/or Automaze. *See Exhibits 3, 5, 8, 9.*

### E.   VALIDITY / INVALIDITY ANALYSIS ON DEPENDENT CLAIM 5: SPACER

124.    Claim 5 depends from Claim 1 and requires "at least one spacer positioned between the cylindrical cupholder and the adapter base." The Court adopted the plain and ordinary meaning of "spacer," i.e., a discrete intervening component that separates two structures to create space or provide an attachment interface.

#### i.   Prior Art Discloses Spacer

125.    In addition to the structural base separating the cupholder from the adapter, Cashin (U.S. Patent No. 9,220,349) discloses an O-ring (element 33) positioned between the bottom of the cylindrical cupholder and the top surface of the adapter base. *See Exhibit 7.* This O-ring is a discrete intervening component that creates vertical separation and provides a frictional interface between the two structures. It cushions the cupholder, prevents loosening of the clamping mechanism, and stabilizes the assembly. A POSITA would recognize that this O-ring satisfies the "spacer" limitation of Claim 5, both functionally and structurally, as it separates the cupholder from the adapter base and facilitates attachment.

126.    Cashin also describes a multi-hole base structure that supports interchangeable accessories, including cupholders and closed-captioning devices. *See Exhibit 7.* This base acts as a spacer by creating vertical separation and providing a mounting interface between the cupholder and the underlying clamping mechanism. The combination of the O-ring and the base structure provides multiple spacer-like functions consistent with the Court's construction.

127.    Fan (U.S. Patent No. 11,254,253) similarly discloses a spacer element in the form of a receiving base positioned between the rotating cupholder unit and the lower adapter base. *See Exhibit 5.* Critically, the rotating unit does not rotate atop the adapter base unit.  The rotating unit, sits on, and rotates atop the receiving base, which is positioned as a spacer between the cupholder unit and the

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

INHOUSE CO. LAW FIRM

adapter base, maintaining vertical space between the two. This discrete structural component would be recognized by POSITA as a spacer under the Court's definition.

### ii.    Motivation to include a spacer

128.    The rationale for including a spacer between the cylindrical cupholder and the adapter base was well known to a POSITA. First, spacers accommodate deepset OEM cupholders by raising the cupholder height, ensuring ergonomic access for the taller user. Second, they allow clearance for console lids, gear shifter handles and other obstructions — a need explicitly illustrated in the '539 patent itself at Fig. 20. Third, spacers provide a stable attachment interface for accessories such as trays, phone holders, or closed-captioning devices. Fourth, they enable modularity and interchangeability, allowing manufacturers to adapt a common base design to multiple cupholder configurations without redesigning the entire lower assembly. These routine design considerations would have made the inclusion of a spacer both obvious and expected to a POSITA.

### iii.    Conclusion as to Validity / Invalidity Analysis of Claim 5

129.    Claim 5 is not anticipated under 35 U.S.C. §102 because the Expander Product does not expressly disclose a discrete spacer positioned between the cylindrical cupholder and the adapter base. However, Claim 5 is nonetheless obvious under 35 U.S.C. §103. Cashin discloses an O-ring and a multi-hole base structure that function as spacers, while Fan discloses a receiving base that provides vertical separation, rotation and attachment functionality. *See Exhibits 5, 7.* A POSITA would have been motivated to incorporate such spacer elements for routine, predictable reasons including improved stability, modularity, and ease of assembly. Therefore, Claim 5 is obvious under §103 in view of the Expander Product in combination with Cashin and/or Fan. *See Exhibits 3, 5, 7.*

## F.    VALIDITY / INVALIDITY ANALYSIS: DEPENDENT CLAIM 6: SCREW GEAR PROVIDED TO ENABLE MOVEMENT OF LEGS VIA ROTATION

130.    The patent recites in Claim 6 depends from Claim 2 and recites that "a screw gear is provided to enable the movement of the plurality of legs via rotation." The Court construed this limitation to require a mechanism that converts rotational input into radial movement of the legs through a screw gear or equivalent threaded interface.

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

INHOUSE CO. LAW FIRM

i.  Prior Art Discloses Screw Gear Enabling Movement of Legs Via Rotation

131.    The Expander Product discloses exactly this mechanism. Its product description states: "EXPANDABLE BASE FOR DIAMETER 2.5"-3.75' CAR CENTRE CONSOLE CUP HOLDER" to fit different vehicles. *See Exhibit 3 (Expander Product Amazon listing printout, "About this item")*. The accompanying product images show segmented legs at the base that expand outward when the cupholder body is rotated. A POSITA would recognize that this expansion is achieved through a screw-gear or threaded interface: rotation of the cylindrical cupholder body drives a threaded shaft or cam that forces the legs radially outward or inward. This is a standard and predictable way to implement rotation-actuated expansion in consumer cupholder adapters.

132.    Even if the precise geometry of the Expander Product's screw/scroll mechanism differs from the embodiment in the '539 Patent, the function, way, and result are the same:

- **Function:** convert rotation of the cupholder body into radial movement of the legs.
- **Way:** through a screw-gear or threaded interface that translates rotary motion into linear/radial displacement.
- **Result:** expansion and retraction of the base diameter to fit different OEM cupholders.

A POSITA would recognize this as satisfying the Court's construction of Claim 6.

133.    Cashin (U.S. Patent No. 9,220,349) discloses a screw-based expansion mechanism. The cylindrical cupholder includes an integral adjustment screw (element 26) that passes through the base and engages a threaded drive hub (element 40). *See Exhibit 7*. When the cupholder is rotated, the drive hub travels along the screw, forcing pivot arm assemblies (elements 22a–d) radially outward to clamp against the inner wall of the OEM cupholder (Cashin, Col. 4:10–35; FIGS. 1–2, 7–9). This mechanism converts rotational input into radial expansion of the legs and satisfies the screw gear limitation of Claim 6.

134.    Fan (U.S. Patent No. 11,254,253) does not disclose a traditional screw gear with a threaded shaft. However, it teaches a rotational actuation mechanism that a POSITA would recognize as functionally equivalent. *See Exhibit 5*. Specifically, Fan discloses a rotating unit (element 2) with a spiral guide groove (element 21) that receives guide blocks (element 314) attached to expansion units (element 3). As the rotating unit turns, the guide blocks travel along the spiral groove, causing the

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

INHOUSE CO. LAW FIRM

expansion units to move linearly and protrude outward through the base's through-holes (Fan, FIGS. 1–2, 4–7B; Col. 5:10–45). This mechanism converts rotary motion into radial displacement of the legs.

135.   Under the function-way-result framework:

- **Function:** Convert rotation of the cupholder assembly into radial movement of the legs.
- **Way:** Using a spiral guide groove and guide blocks instead of a threaded shaft.
- **Result:** Expansion and retraction of the base diameter to fit different OEM cupholders.

136.   A POSITA would understand this spiral groove mechanism as an alternative, well-known approach to achieving the same result as a screw gear. Therefore, even if not literally a "screw gear," Fan's mechanism satisfies the limitation of Claim 6 under the doctrine of equivalents or renders it obvious in view of known design alternatives.

### ii.   Motivation to use a screw gear

137.   A POSITA would have been motivated to employ a screw gear mechanism to enable movement of expandable legs via rotation for routine, predictable reasons. First, screw gears are the most common and reliable means of converting rotary motion into linear or radial displacement, a principle widely used in clamps, jacks, chucks and adjustable fixtures. Second, they offer fine control and secure locking, ensuring that once the legs are expanded to fit a vehicle's OEM cupholder, they remain stable during use. Third, screw gear mechanisms are inexpensive to manufacture and easily integrated into consumer-grade plastic or metal assemblies, making them ideal for mass-market automotive accessories. Fourth, the use of a screw gear complements the rotation-actuated design already disclosed in Claim 2, allowing the round cupholder body itself to serve as the actuator without requiring additional levers or buttons. Finally, a POSITA would recognize that alternative rotational actuation systems — such as the spiral groove mechanism disclosed in Fan — achieve the same functional outcome and could be substituted without inventive effort. These motivations reflect well-established engineering practices and consumer product design principles, and would have made the inclusion of a screw gear mechanism both obvious and expected at the time of invention.

### iii.   Conclusion as to Validity / Invalidity Analysis of Claim 6

138.   Claim 6 is anticipated under 35 U.S.C. §102 by the Expander Product, which discloses a screw gear or threaded actuation mechanism that enables the movement of the plurality of legs via rotation. *See Exhibit 3.* Even if the Court were to conclude that the Expander Product does not literally

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

INHOUSE CO. LAW FIRM

disclose every detail of the screw gear geometry, Claim 6 is nonetheless obvious under 35 U.S.C. §103. Cashin discloses a literal screw gear mechanism, and Fan discloses a spiral groove mechanism that a POSITA would recognize as functionally equivalent. *See Exhibits 5, 7.* Therefore, Claim 6 is anticipated under §102 and, in the alternative, is rendered obvious under §103 in view of the Expander Product alone or in combination with Cashin and/or Fan. *See Exhibits 3, 5, 7.*

## G. VALIDITY / INVALIDITY ANALYSIS ON DEPENDENT CLAIM 7: CUPHOLDER ADAPTER WHEREIN THE MINIMUM DIAMETER IS 2.6 INCHES AND THE MAXIMUM DIAMETER IS 3.8 INCHES

139.    Claim 7 depends from Claim 1 and recites that "the minimum diameter is 2.6 inches and the maximum diameter is 3.8 inches." The Court adopted the plain and ordinary meaning of this limitation, which requires that the adapter base be capable of expanding from at least 2.6 inches to at most 3.8 inches in diameter.

### i.    Prior Art Discloses Adapter Base Operating Within Claimed Range

140.    The Expander Product prior art (ASIN B07PMHPJJF) expressly discloses an expandable base designed to fit vehicle cupholders ranging from approximately 2.5 inches to 3.75 inches in diameter. *See Exhibit 3 (Amazon.com product page, "Date First Available: March 13, 2019").* This range substantially overlaps with the claimed 2.6–3.8 inch range.

141.    Under Manual of Patent Examining Procedure (MPEP) §2131.03(I), "[w]hen, as by a recitation of ranges or otherwise, a claim covers several compositions, the claim is 'anticipated' if one of them is in the prior art." The Federal Circuit has consistently held that disclosure of a single point or overlapping range anticipates a claimed range. See *Titanium Metals Corp. v. Banner*, 778 F.2d 775, 782 (Fed. Cir. 1985); *ClearValue, Inc. v. Pearl River Polymers, Inc.*, 668 F.3d 1340, 1345 (Fed. Cir. 2012).

142.    Here, the prior art's 2.5–3.75 inch range overlaps nearly entirely with the claimed 2.6–3.8 inch range. Because the patentee has not demonstrated any criticality or unexpected results tied to the precise endpoints of 2.6 and 3.8 inches, the overlap is sufficient to anticipate Claim 7 under 35 U.S.C. §102.

### ii.    Motivation to Include this Feature

143.    Even if the Court were to conclude that the Expander Product (Exhibit 3) does not literally anticipate Claim 7, the claim is nonetheless obvious. MPEP § 2144.04(IV)(A) explains that a

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

INHOUSE CO. LAW FIRM

change in size is generally recognized as being within the level of ordinary skill in the art. The Federal Circuit has repeatedly held that discovering optimum or workable ranges of result-effective variables is ordinarily obvious. See *In re Peterson*, 315 F.3d 1325, 1329 (Fed. Cir. 2003) (overlapping ranges render claims prima facie obvious); *In re Aller, 220 F.2d 454, 465 (C.C.P.A. 1955)* (routine optimization of ranges is obvious). The Supreme Court in *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007), further emphasized that predictable variations and routine optimization fall squarely within §103.

144.    A person of ordinary skill in the art ("POSITA") would have been motivated to design a cupholder adapter with a minimum diameter of approximately 2.6 inches and a maximum diameter of approximately 3.8 inches for routine, predictable reasons:

- **Alignment with OEM Standards:** These dimensions correspond to common OEM cupholder sizes found in passenger vehicles, which typically range from 2.5 to 4.0 inches in diameter.

- **Broad Compatibility Without Over-Extension:** Selecting this range ensures compatibility across vehicle interiors without requiring excessive expansion that could compromise mechanical integrity or user experience.

- **Balance of Stability and Adaptability:** A 2.6–3.8 inch range balances stability and adaptability. Designing to a broader range of "outlier" diameters would likely involve negative trade-offs of stability in the most commonly occurring ones.

- **Industry Norms and Consumer Expectations:** This range reflects consumer expectations and industry norms, as evidenced by commercial products such as the Expander Product (Exhibit 3), the CARSA Cupholder (Exhibit 8), and the Automaze Cupholder (Exhibit 9), which target similar dimensions.

145.    Commercial products such as the CARSA Cupholder (ASIN B08H86W469, Exhibit 8) and the Automaze Cupholder (ASIN B084GTHNWC, Exhibit 9) are marketed as compatible with bottles and mugs in the 3.4–4.0 inch diameter range. These products necessarily include adapter bases that expand and contract to accommodate diameters within and beyond the claimed range. A POSITA would understand that designing an adapter base to span 2.6–3.8 inches is a routine engineering choice driven by standard vehicle cupholder dimensions and consumer bottle sizes.

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

INHOUSE CO. LAW FIRM

146.    A POSITA would have viewed this range as an optimal design choice based on ergonomic, mechanical, and market-driven considerations. As the Federal Circuit explained in *In re Applied Materials, Inc.*, 692 F.3d 1289, 1295 (Fed. Cir. 2012), where the prior art teaches a range and the claimed range is a predictable variation, the burden shifts to the patentee to show criticality or unexpected results. No such evidence exists here.

### iii.  Critical Rebuttal

147.    The Federal Circuit has made clear that absent evidence of criticality or unexpected results, overlapping or adjacent ranges are anticipated or obvious. See *ClearValue, Inc. v. Pearl River Polymers, Inc.*, 668 F.3d 1340, 1345 (Fed. Cir. 2012) (overlapping ranges anticipate absent criticality); *Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 999 (Fed. Cir. 2006) (narrower range patentable only where patentee showed criticality and unexpected results).

148.    Here, there is no evidence that the claimed 2.6–3.8 inch range produces any unexpected results or solves a problem not already addressed by prior art ranges such as 2.5–3.75 inches (Expander Product, Exhibit 3) or 3.4–4.0 inches (CARSA and Automaze, Exhibits 8–9). The claimed range is simply a routine optimization of known parameters to fit standard OEM cupholders. Accordingly, Claim 7 cannot be distinguished on the basis of criticality.

### iv.  Conclusion as to Validity / Invalidity Analysis of Claim 7

149.    Claim 7 is anticipated under 35 U.S.C. §102 because the Expander Product (Exhibit 3) discloses an overlapping range of 2.5–3.75 inches, which substantially coincides with the claimed 2.6–3.8 inch range. Under MPEP §2131.03 and cases such as *Titanium Metals Corp. v. Banner*, 778 F.2d 775 (Fed. Cir. 1985), and *ClearValue, Inc. v. Pearl River Polymers, Inc.*, 668 F.3d 1340 (Fed. Cir. 2012), disclosure of a single point or overlapping range anticipates absent evidence of criticality. Even if not anticipated, Claim 7 is obvious under 35 U.S.C. §103 because selecting this range would have been an obvious design choice in view of the Expander Product, further supported by CARSA (Exhibit 8) and Automaze (Exhibit 9). As explained in MPEP §2144.04(IV)(A) and cases such as *In re Peterson*, 315 F.3d 1325 (Fed. Cir. 2003), *In re Aller*, 220 F.2d 454 (CCPA 1955), and *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007), optimizing known, result-effective variables is routine and obvious. A POSITA would have been motivated to adopt the 2.6–3.8 inch range to align with OEM cupholder standards, ensure broad compatibility, and balance stability with adaptability. Finally, there is no evidence that the

**NONINFRINGEMENT AND INVALIDITY EXPERT REPORT OF ERIC NOBLE**

INHOUSE CO. LAW FIRM

claimed range is critical or produces unexpected results, distinguishing this case from *Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991 (Fed. Cir. 2006). Accordingly, Claim 7 is both anticipated and, in the alternative, obvious in view of the prior art.

### H.  CONCLUSION ON VALIDITY / INVALIDITY ANALYSIS ON DEPENDENT CLAIMS 2-7

150.    Claims 2 through 7 are obvious under 35 U.S.C. §103 in view of the Expander Product alone or in combination with Cashin, Fan, CARSA, and/or Automaze. Each dependent claim recites a design feature that reflects routine, predictable engineering choices grounded in well-known consumer product design principles. The rotation-actuated expansion of legs (Claim 2), alignment and off-set configurations (Claims 3 and 4), use of a spacer (Claim 5), screw gear mechanism (Claim 6), and diameter range of 2.6 to 3.8 inches (Claim 7) are all disclosed or rendered obvious by the prior art. A POSITA would have been motivated to incorporate these features to improve compatibility, modularity, and stability across vehicle interiors. None of the dependent claims reflect a non-obvious advance over the prior art, and each is obvious under §103.

### XI.    <u>CONCLUSION</u>

151.    Based on the analysis above and for all the previously stated reasons, it is my opinion that Plaintiffs' Accused Products do not meet all the limitations of Defendant Benjamin Cook's '539 Patent and also that Benjamin Cook's '539 Patent is unpatenable for being anticipated and/or obvious over prior art.

152.    I reserve the prerogative to amend or supplement this report based on further discovery and preparation in this action, including my review of any expert reports or other expert testimony submitted on behalf of Plaintiffs.

I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct.

Executed on October 17, 2025



/s/ Eric Noble_____
Eric Noble

INHOUSE CO. LAW FIRM

**EXHIBIT B**

# INVOICE

**The CARLAB, Inc.**
217 Chapman Ave
Orange, CA 92866

spocock@thecarlab.com
+1 (714) 532-0192



**Bill to**

Theodore Lee

Inhouse Co. Law Firm

7700 Irvine Center Dr. , Ste 800

Irvine, CA 92618

**Ship to**

Theodore Lee

Inhouse Co. Law Firm

7700 Irvine Center Dr. , Ste 800

Irvine, CA 92618

**Invoice details**

Invoice no.: 23167

Terms: Net 30

Invoice date: 11/10/2025

Due date: 12/10/2025

| Date | Product or service | Description | Amount |
|---|---|---|---|
| | **Consulting** | Inhouse Co. - Topfire Ltd. vs. Benjamin Cook | $12,903.30 |
| | | E. Noble Consulting Hours: | |
| | | 10/10: EN - 0.75 hours meet with Inhouse legal team to review case and discuss merits prior to agreement to provide expert opinion. (Session not billed, per standard practice with client) | |
| | | 10/10 EN - 1 hrs. review supplied physical specimens and 539 Patent document. | |
| | | 10/10 EN - 0.75 hrs videoconference call with Alex and Theodore attys to get background on case, applicable law. | |
| | | 10/11 EN - 0.25 hours download and begin review of prior art documents sent by Inhouse | |
| | | 10/12 EN - 4.1 hours review and partial edits of Expert Report V3 including Infringement / Non-infringement Analysis of Independent Claim 1 | |
| | | 10/13 - EN 6.4 hours editing/writing NONINFRINGEMENT AND INVALIDITY EXPERT REPORT through Paragraph 63 including examination and image creation of Master Show cupholder device for substitution of prior image in Paragraph 25. | |

10/14 EN - 4.3 hours editing Expert Report of Eric Noble and annotate Prior Art cited to The Patent-in-Suit. Study and annotate Prior Art Cited in the Patent-in-Suit, sections B., C., D., E.,. Restart edits on revised Expert Report of Eric Noble v8 doc sent from client.

10/16 EN - 9.0 hrs reading balance of prior art materials and fully editing 10/17 draft of Expert Report, all sections.

10/17 EN - 0.75 hours review all 3 docs - Exhibits, Redline and Final - of Expert Opinion and send approval and permission to e-sign to client atty team.

Total Hours = 26.55
Fees @ $486 per hour = $12,903.30

---

**Ways to pay**

Total

**$12,903.30**

BANK

---

> [ View and pay ]

# EXHIBIT C

Louis F. Teran (SBN 249494)
lteran@slclg.com
SLC LAW GROUP
1055 E. Colorado Blvd., Suite #500
Pasadena, CA 91106
Telephone:  (818) 484-3217 x200
Facsimile:  (866) 665-8877

Attorneys for Defendant
Benjamin D. Cook

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TOPFIRE LIMITED, et al.,<br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br>BENJAMIN D. COOK,<br><br>　　　　　　Defendant.<br>_____<br>BENJAMIN D. COOK,<br><br>　　　　　　Counter-Claimant,<br><br>　　v.<br><br>TOPFIRE LIMITED, et al.,<br><br>　　　　　　Counter-Defendant | Case No.:  2:23-cv-02503-DAD-JDP<br><br><br>**NOTICE OF DEPOSITION OF PLAINTIFF'S DESIGNATED EXPERT WITNESS ERIC NOBLE** |

TO ERIC NOBLE, AND TO HIS ATTORNEYS:

PLEASE TAKE NOTICE THAT the deposition of Eric Noble, Plaintiff's designated expert witness, shall be conducted pursuant to the Federal Rules of Civil Procedure under the supervision of an officer who is authorized to administer an oath as follows:

DATE:          November 7, 2025

TIME:          10:00 a.m. (Pacific Time)

PLACE:         Coalition Court Reporters
               205 S. Broadway
               Suite 1008
               Los Angeles, CA 90012

Said deposition will continue from day to day excluding Saturdays, Sundays, and holidays, until completed.

If an interpreter is required to translate testimony, notice of same must be given at least fifteen (15) days before the deposition date, including the special language and/or dialect needed. The interpreter, however, will not be available for assistance with any pre-deposition conference between deponent and his/her attorney. Please be advised there is a 48-business hour cancellation policy for interpreters. You will be liable for the full fee if you fail to comply with this cancellation policy.

PLEASE TAKE FURTHER NOTICE that said deposition may be videotaped or audiotaped. Plaintiff also intends to use the videotape as evidence at the time of trial.

NOTICE IS FURTHER GIVEN that deponent is required to bring with him/her to the deposition the documents and things described in ATTACHMENT A.

DATED: October 23, 2025

By:_____

Louis F. Teran

Attorney for
Defendant/Counter-Claimant
Benjamin D. Cook

2

# ATTACHMENT  A

# DEFINITIONS

Unless the context clearly requires otherwise, the following definitions and instructions shall apply to these requests:

"YOU" OR "YOUR" (or any derivative thereof) as used herein shall refer to Eric Noble, Plaintiffs' designated expert witness, including its officers, owners, agents, affiliates subsidiaries, parent business entities, successors, assigns, employees, affiliates, subsidiaries, attorneys, accountants, investigators, and anyone else acting on its behalf.

The term "DOCUMENTS" shall mean any writing or recording, including, but not limited to, any printed, typewritten, handwritten, computer created, or machine generated manner of reproduction thereof, or whatever character including, without limitation, handwritten notation, emails, text messages, diaries, calendar notations, appointment books, letters, memoranda, contracts, agreements, expense accounts, expense account reports, time sheets, or records, bank account records, billing sheets and /or description of billed amounts, minutes of meetings, drawings, graphs, charts, photographs, phonograph records, data processing reports, and forms, data compilations from which information can be obtained or translated through detection devices into reasonable usable forms, diagrams, symbols, telegrams, telexes, telephone records or logs, and any non-identical copies of any of the foregoing combinations of any of the foregoing, whether original, draft or copy.

The term "CORRESPONDENCE" shall mean and include written and oral forms, whether made by telephone, email, letters, in person or otherwise.  This includes any letter, memorandum, email, text message, fax, or other writing.

The term "COMMUNICATION" shall mean any transfer of information of any kind, orally, in writing, or by any other manner, at any time or place, and under any circumstances whatsoever and shall include, but is not limited to, the following:  contracts or agreements; drawings or sketches; invoices, orders, or acknowledgements; dairies or reports; forecasts or appraisals; memoranda of telephonic or in person communications by or with any person; other memoranda, letters, electronic mail, telegrams, telexes, or cables

3

prepared, drafted, received, or sent; tapes transcripts, or recordings; photographs, pictures, or films; computer programs, computer data, or computer printouts; or graphic, symbolic, recorded, or written materials of any nature whatsoever.

The words "AND/OR" shall both be deemed to be conjunctive and inclusive, as to call for disclosure of all such information.

The terms "DESCRIBE", "REFER", "RELATE", "RELATING TO", "RELATES TO" and "REGARDING" mean, without limitation, relating to, regarding, constituting, concerning, mentioning, referring to, describing, summarizing, evidencing, listing, relevant to, demonstrating, or tending to prove, disprove, or explain.

The term "CONCERNING" means referring to, describing, or evidencing.

The term "PERSON" shall refer to any individual natural person, proprietorship, corporation, partnership, trust, joint venture, association, organization, business entity, or governmental agency.

When referring to a person, "IDENTIFY" means to give, to the extent known, the person's full name, present or last known address, present or last known telephone number, present or last known email, and present or last known place of employment. When referring to a company, "IDENTIFY" means to give, to the extent known, the company's full corporate name, a brief description of the general nature of the business, its state of incorporation, the address and principal place of business, the telephone number, the email, and the identity of the officers or other persons having knowledge of the matter with respect to which the company has been identified. Once a person or company has been identified in accordance with this subparagraph, only the name of that person or company need be listed in response to subsequent discovery requesting the identification of that person or company.

When referring to documents, "IDENTIFY" means to give, to the extent known, the (a) type of document; (b) general subject matter; (c) date of the document; and (d) author(s), addressee(s), and recipient(s).

The use of a singular includes the plural, and vice versa.

The use of one gender includes all others, appropriate in context.

4

The term "PROPOUNDING PARTY" shall refer to Benjamin Cook, a party to this action, including its officers, owners, agents, affiliates subsidiaries, parent business entities, successors, assigns, employees, affiliates, subsidiaries, attorneys, accountants, investigators, and anyone else acting on its behalf.

The term "ACCUSED PRODUCT" shall refer to any and all products that Plaintiffs allege is covered by U.S. Patent No. 11,772,539.

The term "PATENT" shall refer to U.S. Patent No. 11,772,539 ("the '539 Patent").

## INSTRUCTIONS

1.     You are to produce all DOCUMENTS and things requested that are in YOUR possession, custody, or control.  A document is deemed to be in YOUR possession, custody, or control if the document is in YOUR physical custody, or in the physical custody of any other person and YOU own the requested document in whole or in part; has a right by contract, statute or otherwise to use, inspect, examine, or copy the requested document on any terms; has an understanding, whether express or implied, that YOU may use, inspect, examine, or copy the requested document on any terms; has as a practical matter, been able to use, inspect, examine, or copy the requested document when YOU have sought to do so; or is able to lawfully use, inspect, examine, or copy the requested documents.  Documents within YOUR possession, custody, or control include, but are not limited to, documents that are in the custody of YOUR attorney or other agents.

2.     Where a request calls for one or more DOCUMENTS as to which YOU claim any privilege or protection as grounds for nonproduction, please set forth the following with respect to each document:

a.  The privilege or protection that YOU claim precludes disclosure;

b.  The subject matter of the document (without revealing the content as to which privilege is claimed);

c.  Any additional facts on which YOU base YOUR claim of privilege or protection;

d.  The type of document;

e.  The date of the document;

5

f.  The name, business address and present position of the author(s) or originator(s) of the document;

g.  The position of the author(s) or originator(s) of the document at the time the document was prepared;

h.  The names and address of all persons or entities who have received a copy of the document;

i.  The position of each recipient of the document or information at the time the document was prepared and at the time the document was received; and

j.  If the protection of the work product doctrine is asserted, the proceeding in anticipation of which the document was prepared.

3.  Identify any and all DOCUMENTS described in this document request that have been destroyed.

4.  Identify the source of all DOCUMENTS produced, and the person for whom, or department, division, or office for which such DOCUMENTS are maintained.

5.  DOCUMENTS shall be produced in their original file folders or, in lieu thereof, any writing on the file from which the DOCUMENT is taken shall be copied and appended to such DOCUMENT, and the person for whom or department, division, or office for which such file folder is maintained shall be identified.

6.  Each DOCUMENT produced to this request shall be identified in such production by the paragraph number of this DOCUMENT request in response to which is produced.

## DOCUMENTS AND THINGS TO PRODUCE

### REQUEST NO. 1

Any and all materials and DOCUMENTS, which were reviewed in anticipation of, or in preparation for this deposition, including but not limited to any and all physical products, patents, or Amazon listings.

### REQUEST NO. 2

Any and all materials and DOCUMENTS which YOU used, either directly or indirectly to form the basis of any assumptions, opinions, and/or conclusions concerning any of the

issues in this case, including but not limited to any and all physical products, patents, or Amazon listings.

**REQUEST NO. 3**

Any and all DOCUMENTS, which reflect the billings for service, time slips or work logs rendered by YOU in connection with this action.

**REQUEST NO. 4**

Any and all DOCUMENTS which reflect YOUR qualifications, experience, education and/or training on which YOU intend to rely in qualifying as an expert with respect to YOUR opinions in the action which is the subject matter of this lawsuit.

**REQUEST NO. 5**

Any and all billing sheets, notes, memoranda, written reports, and other documents, tangible evidence or writings which YOU have prepared or relied on in connection with YOUR involvement in this lawsuit.

**REQUEST NO. 6**

Any and all Curriculum Vitae and/or resume that YOU prepared within the last three (3) years.

**REQUEST NO. 7**

A complete list of any and all articles, books, or literature authored, edited or contributed by YOU.

**REQUEST NO. 8**

All records, documents, and writings, reviewed or to be reviewed by YOU in this case.

**REQUEST NO. 9**

All reports, notes, and other writings prepared by YOU concerning this case.

**REQUEST NO. 10**

 A complete list of articles, books, literature, scientific texts, treatises, journals or similar publications considered, referred to or relied upon by YOU in forming YOUR opinions with regard to this case.

**REQUEST NO. 11**

If the items listed in No. 10 above are unavailable, then a list of the title, author, publisher,

1  date and chapter or page information concerning any such materials.

2  **REQUEST NO. 12**

3  Any and all depositions, testimony transcripts, statements (written, recorded or otherwise),

4  newspaper articles, journal articles, or any other documents reviewed by YOU as part of

5  YOUR review of the case herein used in anyway, directly or indirectly, in the formation

6  by YOU of any opinions YOU have as to the present case, or any of the issues in the

7  present case.

8  **REQUEST NO. 13**

9   Any and all telephone messages to YOU, or generated by YOU, regarding YOUR review

10  of materials pertaining to this case, or YOUR examination of the products and documents

11  identified in this case..

12  **REQUEST NO. 14**

13   Any and all billings, invoices, ledger sheets, statements for services and other records

14  regarding YOUR compensation for the review of this case.

15  **REQUEST NO. 15**

16  Any other tangible or documentary item or evidence used, relied upon, reviewed, referred

17  to and/or in any way connected with YOUR review of this action.

18  **REQUEST NO. 16**

19  Copies of any notices, announcements, advertising materials or any form of printed

20  materials whatsoever pertaining to the availability of YOUR services as an expert

21  consultant, including, but not limited to, any such documents YOU have mailed or

22  otherwise distributed to anyone within the last four years.

23  **REQUEST NO. 17**

24  All notes, tape recordings, highlighted or under lighted reports, copies of depositions and

25  other materials made during, or as a part or result of, YOUR review of this case.

26  **REQUEST NO. 18**

27  All correspondence authored by YOU or made available to YOU relative to any aspect of

28  the subject matter of this case.

8

**REQUEST NO. 19**

A list of all literature, which YOU feel, is authoritative on the subject matter of this case.

**REQUEST NO. 20**

All literature used by YOU, over the past five years, to describe to clients or others any system or process used in designing consumer products.

**REQUEST NO. 21**

A complete list of any and all reports YOU have created, submitted, or have had submitted or created on your behalf pursuant to Federal Rule of Civil Properties, Rule 26(a) in the last 5 years.

**REQUEST NO. 22**

A complete list of any and all publications authored by YOU related to cupholders.

**REQUEST NO. 23**

A complete list of any and all cases that YOU testified as an expert at trial or by the deposition.

**REQUEST NO. 24**

 A list of all cases which YOU have testified at deposition, arbitration or trial in the last 4 years, at the request of an attorney, including (a) the full name of the case; (b) the case number; (c) the name and address of the attorney who retained you and (d) the name and address of the attorney for all other parties.

**REQUEST NO. 25**

If any of the above-items, as described in No. 1-24, are unavailable at the time and place of this deposition, YOU are requested to identify where such items are located, who has possession of them, and how they may be obtained through the formal processes of the Court.

**REQUEST NO. 26**

Any and all CORRESPONDENCE, including but not limited to emails, text messages, and voicemails related to this case, between YOU and any of the Plaintiffs in this case.

**REQUEST NO. 27**

Any and all CORRESPONDENCE, including but not limited to emails, text messages,

9

and voicemails related to this case, between YOU and Alexander Chen.

**REQUEST NO. 28**

Any and all CORRESPONDENCE, including but not limited to emails, text messages, and voicemails related to this case, between YOU and Katja M. Grosch.

**REQUEST NO. 29**

Any and all CORRESPONDENCE, including but not limited to emails, text messages, and voicemails related to this case, between YOU and Theodore S. Lee.

**REQUEST NO. 30**

Any and all CORRESPONDENCE, including but not limited to emails, text messages, and voicemails related to this case, between YOU and any attorney representing Topfire Limited.

**REQUEST NO. 31**

Any and all CORRESPONDENCE, including but not limited to emails, text messages, and voicemails related to this case, between YOU and any attorney representing any of the Plaintiffs in this case.

**REQUEST NO. 32**

Any and all CORRESPONDENCE, including but not limited to emails, text messages, and voicemails related to this case, between YOU and Topfire Limited.

**REQUEST NO. 34**

Any and all CORRESPONDENCE, including but not limited to emails, text messages, and voicemails related to this case, between YOU and Amazon.com, Inc.

**REQUEST NO. 35**

Any and all CORRESPONDENCE, including but not limited to emails, text messages, and voicemails related to this case, between YOU and any attorney representing Amazon.com, Inc.

DATED:  October 23, 2025

By:_____

     Louis F. Teran

     Attorney for
     Defendant/Counter-Claimant
     Benjamin D. Cook

1

## **PROOF OF SERVICE**

2    I am employed in the County of Los Angeles, State of California.  I am over the

3 age of 18 and not a party to the within action.  My business address is 1055 East

4 Colorado Blvd., Suite 500, Pasadena, CA 91106.  My electronic notification address is

5 lteran@slclg.com.

6    On October 23, 2025, I served the within document(s) described as:

7 **NOTICE OF DEPOSITION OF PLAINTIFF'S DESIGNATED EXPERT WITNESS**

8 **ERIC NOBLE**

9 on the interested parties in this action as stated below:

10 SEE ATTACHED SERVICE LIST

11

12 _X_    I placed a true copy of the foregoing document(s) in a sealed envelope addressed

13    as set forth above.  I deposited each such envelop for mailing with USPS on that

14    same day.

15 _X_    I emailed all of the pages of the above-entitled document to the recipients' emails

16    as indicated in the attached service list.

17 ____    I faxed all of the pages of the above-entitled document to the recipients' facsimile

18    number as indicated in the attached service list.

19 ____    I caused all of the pages of the above-entitled document to be delivered by hand

20    to the offices of each recipient as indicated in the attached service list.

21

22    I declare under penalty of perjury under the laws of the State of California that the

23 foregoing is true and correct.

24

25 DATED:  October 23, 2025

    By:_____

26

27    Louis F. Teran

28

12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>SERVICE LIST</u>**
Topfire Limited et al. v. Benjamin D. Cook
Case No. 2:23-cv-02503-DAD-JDP


Alexander Chen
Alexc@inhouseco.com
Katja M. Grosch
kmg@inhouseco.com
Theodore S. Lee
Tlee@inhouseco.com
**INHOUSE CO. LAW FIRM**
7700 Irvine Center Drive, Suite 800
Irvine, CA 92618
Telephone:  949-250-1555
Facsimile:   714-882-7770




DATED:  October 23, 2025

By:_____

Louis F. Teran

Attorney for
Defendant/Counter-Claimant
Benjamin D. Cook

13

# EXHIBIT D

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA


TOPFIRE LIMITED, et al.,  )
                   )
        Plaintiffs, )
                   )
     vs.            )Case No. 2:23-CV-02503-DAD-JDP
                   )
BENJAMIN D. COOK,     )
                   )
        Defendants. )
_____)

**ORIGINAL**




DEPOSITION OF

ERIC NOBLE



Friday, November 7, 2025

10:05 a.m.




205 South Broadway

Suite 1008

Los Angeles, California

1   Deposition of ERIC NOBLE, called as a witness by the

2   Defendants, before SONSERAYE ANDERSON, Certified

3   Shorthand Reporter Number 13385, for the State of

4   California, with principal office in the County of Los

5   Angeles, commencing at 10:05 a.m., Friday, November 7,

6   2025, at 205 South Broadway, Suite 1008, Los Angeles,

7   California.

8                        *   *   *

9   APPEARANCES:

10
      FOR THE PLAINTIFFS TOPFIRE LIMITED:
11
          INHOUSE CO. LAW FIRM
12        BY:  ALEXANDER CHEN, ESQ.
          -AND- THEODORE LEE, ESQ.
13        7700 Irvine Center Drive
          Suite 800
14        Irvine, California 92618
          (714) 882-7770
15        alexc@inhouseco.com
          Tlee@inhouseco.com
16

17    FOR THE DEFENDANT BENJAMIN D. COOK:

18        STRATEGIC LEGAL COUNSELING - PAS
          BY:  LOUIS F. TERAN, ESQ.
19        1055 East Colorado Boulevard
          Suite 500
20        Pasadena, California 91106
          (818) 484-3217
21        lteran@slclg.com

22

23

24

25

```
 1            Is this a personal injury case?

 2       A. Not that I'm aware of.

 3       Q. Okay.

 4            What kind of a case is this?

 5       A. As written in my report.

 6       Q. Okay.

 7            Is this a trademark infringement case?

 8       A. As written in my report.

 9       Q. Yes.

10            Is there a trademark infringement case?

11       A. As written --

12            MR. CHEN:  Asked and --

13            THE WITNESS:  -- in my report.

14            MR. CHEN:  -- answered.

15  BY MR. TERAN:

16       Q. All right.

17            I think that's sufficient for disqualifying

18  him, but I'll proceed.

19            What is your educational background?

20       A. I have a degree in economics and a degree in

21  automotive technology.

22       Q. Where did you get a degree in economics?

23       A. Cal State University of Fullerton, Mihaylo

24  School of Business.

25       Q. And you said automotive technology?
```

 1          A. I did.

 2          Q. And what is that?

 3          A. I'm not clear on your question, sir.

 4          Q. What is an automotive technology degree?  What

 5     kind of degree is that?

 6              MR. CHEN:  Objection.  Vague.

 7              THE WITNESS:  It's -- it's a degree based on

 8     all the systems of the automobile.

 9     BY MR. TERAN:

10          Q. Is that a bachelor's degree?

11          A. That's an associates of science degree.

12          Q. Associates of science.

13              And where did you get that degree?

14          A. Saddleback College.

15          Q. Is that an engineering degree?

16          A. It's an automotive technology degree.

17          Q. Would you consider that to be an engineering

18     degree?

19          A. No.

20          Q. Is that an industrial design degree?

21              MR. CHEN:  Objection.  Vague.

22              THE WITNESS:  No.

23     BY MR. TERAN:

24          Q. Is that a mechanical engineering degree?

25          A. No.

TOPFIRE LIMITED, ET AL., vs BENJAMIN D. COOK                                    ERIC NOBLE
2:23-CV-02503-DAD-JDP, 11/07/2025              ORIGINAL                          Page 16

```
 1          MR. CHEN:  Asked and answered.

 2    BY MR. TERAN:

 3          Q. Okay.

 4             So do you have a mechanical engineering degree?

 5          A. No.

 6          Q. Okay.

 7             Do you have an industrial design degree?

 8          A. No.

 9          Q. Do you have an automotive engineering degree?

10          A. No.

11          Q. So the extent of your education is an economics

12    degree.

13             What kind of a degree was that?

14          A. Bachelor of science.

15          Q. And automotive technologies, that was an

16    associates degree?

17          A. Associates of science degree.

18          Q. Is that Saddleback College a community college?

19          A. It is.

20          Q. Okay.

21             What is your work experience?

22             MR. CHEN:  Objection.  Vague.  Calls for a

23    narrative.

24             THE WITNESS:  In what field, sir?

25    ///
```

 1        Q. Okay.

 2           Did you bring those products with you today?

 3        A. I did not.

 4        Q. And why is that?

 5        A. I hadn't -- forgive me.  I know you're probably

 6    going to tell me otherwise, but, as an expert on other

 7    larger, longer cases, I've never been requested to bring

 8    the physical evidence with me.

 9        Q. Did you receive the notice of deposition?

10        A. I did, sir.

11        Q. And Request No. 2 asks for that, does it not?

12        A. You're telling me it does.  I believe you.

13        Q. Okay.

14           And you read this; correct?

15        A. Yes.

16        Q. And you saw that it requested you to bring

17    these materials with you; correct?

18        A. Forgive me.  I have -- I have become used to

19    having them available during depo.  I apologize.

20        Q. And so you did read them, and you knew that you

21    were supposed to bring these materials, but you did not;

22    is that accurate?

23        A. Didn't read them?

24           What do you mean by "read them"?  I didn't read

25    them?

```
 1        Q. Read the notice of deposition and read the

 2  requests that are listed in there.

 3            MR. CHEN:  So asserting objections again, that,

 4  from a party's level, this request is, um, not in

 5  accordance to Rule 45, and also definitely (inaudible),

 6  according to Rule 30 -- or 34.

 7  BY MR. TERAN:

 8        Q. Okay.  Go ahead.

 9            MR. CHEN:  But those are my objections for my

10  client.

11            MR. TERAN:  For the plaintiff, not the expert?

12            MR. CHEN:  Right.

13            MR. TERAN:  You're not asserting objections for

14  the expert; correct?

15            MR. CHEN:  I'm asserting for the plaintiff.

16            MR. TERAN:  Okay.  Yeah.

17            MR. CHEN:  I'm asserting for the client, my

18  client.

19            MR. TERAN:  And the expert doesn't have his

20  attorney here today?

21            MR. CHEN:  No.  The expert does not have his

22  attorney here today.

23  BY MR. TERAN:

24        Q. All right.

25            So I want to know, Mr. Noble, you made this
```

 1  request in writing.  You received it.  You've read it.

 2  You knew what it wanted you to do.

 3          The request was to bring these materials here

 4  you with today, and you did not; is that accurate?

 5      A. That's accurate.

 6      Q. Okay.

 7          And help me understand why it is you did not

 8  bring these materials with you today.

 9      A. As -- as previously stated, as an expert on my

10  larger, longer cases, I have come to expect larger teams

11  on both sides.

12          And as an expert, I -- I turn up whether it's

13  for deposition, um, or for the hearing, um, or for the

14  Court, and the materials in reference in the suit are at

15  hand.  And I apologize.

16      Q. So you expected me to bring it?

17      A. I expected that someone would be bringing them.

18  Forgive me.

19      Q. Okay.

20          And so you somehow expected that I had some

21  awareness or knowledge as to what materials you reviewed

22  and relied on for your expert opinion and what products

23  you reviewed and examined and somehow I knew this and

24  should have brought them.

25          Is that your -- is that what you're telling me?

```
 1   BY MR. TERAN:

 2        Q. Okay.  Let me know when you're there,

 3   Mr. Noble.

 4        A. I am, but I'm anticipating you're going to ask

 5   me a question or two on it, so I'm going to read it now.

 6        Q. Okay.

 7        A. Because you know I don't like to operate from

 8   memory.

 9        Q. Let me know when you're ready.

10           MR. CHEN:  While we're at it, can I have your

11   e-mail address so I can e-mail these pictures to you?

12           THE COURT REPORTER:  Yes.

13           MR. CHEN:  And you can include them as combined

14   Exhibit 2.

15           THE COURT REPORTER:  Yes.  I'll write it down.

16           MR. CHEN:  And I will cc you, Counsel.

17           MR. TERAN:  Thank you.

18   BY MR. TERAN:

19        Q. Are you ready, Mr. Noble?

20        A. Yes.

21        Q. Okay.  Very good.

22           So going to Paragraph 63 on Page 22 of your

23   report, towards the middle of the paragraph, it says,

24   "In the accused design, loads are partitioned and

25   transferred across mechanical, pin and through-hole
```

 1  joints."

 2          Do you see that?

 3      A. Yes, I do.

 4      Q. All right.

 5          What basis do you have for this assertion?

 6      A. Oh, as -- as an engineer --

 7      Q. You're not an engineer.

 8      A. I -- I don't agree with you on that assessment.

 9      Q. Okay.  Go ahead.

10      A. In fact, I'm a qualified engineer.

11      Q. Okay.

12      A. In fact, in automotive, some of the best

13  engineers don't have engineering degrees; right?

14  Obviously, you've got one, and I'm having to explain

15  automotive terms to you.

16          So I don't agree with your assessment at all

17  that I'm not an engineer.  I'm more than ADOSA in

18  automotive engineering terms.

19      Q. All right.

20          So what is the basis for your assertion here?

21      A. My basis is that -- when I examined the way

22  that the accused is assembled -- right? -- it's clear

23  that it stress is -- are you talking about the stress

24  sentence?

25      Q. No.

1       Q. What I am --

2       A. -- an automotive engineer, sir.

3       Q. What I am asking -- I'm not asking about in a

4  general sense.  I am asking about a very specific

5  product.  The product that is at issue in this case, the

6  accused product --

7       A. Um-hum.

8       Q. -- right?

9       A. Yeah.

10      Q. And -- and you wrote -- this is your words.

11      A. It sure is.

12      Q. The accused design; right?  "In the accused

13  design, loads are partitioned and transferred across

14  mechanical, pin and through-hole joints.

15          And I just want to know:  How did -- what is

16  the basis for you to say this, for this particular

17  design?  I don't want a lesson in physics or

18  engineering.

19          What, in this particular design, gives you the

20  basis to make this assertion?

21      A. Sir, I'm not giving you general answers.  I'm

22  giving you answers informed by my work in automotive

23  engineering.

24          And what I'll tell you is:  When we have a load

25  that enters a component, and we're -- I'm talking about

 1  the tab here -- right? -- that load has to resolve.

 2  That component in space can't do it.

 3         This isn't general theory.  It's going to

 4  resolve where that interface is next.  In this case,

 5  those tabs mechanically interface -- right? -- um,

 6  through mechanical, pin and through-hole joints.

 7      Q. Okay.

 8         Did you test for that?

 9      A. I don't need to test for that.

10      Q. Okay.  All right.

11         Is there any book that you -- you referenced

12  for what you just said?

13         MR. CHEN:  Vague.  And, um, misstating prior

14  testimony.  Foundation.

15         THE WITNESS:  Since -- since you're -- since

16  I'm billing you for this time, I will very happily

17  provided you every volume in a more than 1,000 book

18  automotive reference library in my office.

19  BY MR. TERAN:

20      Q. Did you -- did you reference that when you

21  wrote this?

22      A. I didn't need to.

23      Q. Okay.  Hold --

24      A. It's part --

25      Q. -- on.

 1      A. -- of my education in --

 2      Q. Yes or no.

 3      A. -- the field.

 4      Q. Okay.

 5          You just know; is what you're saying?  You just

 6   know that this is true?  Is that what you're saying?  I

 7   am so educated.  I just know that this is true.

 8          Is that what you're saying?  I didn't need to

 9   look at any textbook, any -- any book, anything.  I

10   didn't even need to do testing.  I just know.  Is that

11   what you're saying?

12          MR. CHEN:  Objection.  Argumentative.  Um,

13   vague.  Foundation.  Compound.  Misstating prior

14   testimony.

15   BY MR. TERAN:

16      Q. Go ahead.

17          Is that what you're saying?  You just know that

18   this is the case?

19          MR. CHEN:  Same objection.

20          THE WITNESS:  What I'm saying is my experience

21   for three decades of engineering in the automotive

22   industry, plus the more than 1,000 volumes in my

23   automotive reference library has all informed me as to

24   the manner in which loads transfer.

25          And, in this case, yep.  That 30 years of

1  experience tells me if I fasten something with pins and

2  through-holes and I put loads into it and it has no

3  other interface, those loads are going to resolve

4  through the through and pinhole mechanical fastening

5  system.  So yes, my experience tells me that.

6  BY MR. TERAN:

7       Q. That's -- that's all I wanted.

8          All right.  The next one -- the next sentence

9  says, "Stress passes through fastener clearances,

10  adhesive layers, or snap-fit lands, introducing joint

11  compliance, stress concentrations, and multiple-stack

12  tolerances."

13         Do you see that?

14      A. I do.

15      Q. What is the basis for that assertion here that

16  you made?

17      A. Because when we have mechanical fasteners --

18  right? -- particularly of two parts from -- of disparate

19  materials -- right? -- and if we've either adhesed them

20  or snap-fit them and have joint -- right? -- we get

21  joint compliance.  It's natural.  We always have that.

22      Q. Is this a general statement again?  I'm talking

23  about the accused product.

24         What fastener clearances?  What adhesive

25  layers?  And it says, "or snap-fit lands."

 1              What is all that?

 2         A. Those are ways in which a load into that tab

 3    can be resolved to -- to the extent the system in the

 4    accused include --

 5         Q. You say may be resolved.

 6         A. Yeah.  Can be resolved.

 7         Q. Did you test for any of this?

 8              MR. CHEN:  Vague.  Lacks foundations.

 9    BY MR. TERAN:

10         Q. I don't want you to theorize.  I don't want you

11    to speculate.

12              Did you test to see whether your assertion here

13    is true and accurate for the design that is at issue in

14    this case, the accused product?

15              MR. CHEN:  Vague.  Foundation.  And, um,

16    misstating prior testimony.

17              THE WITNESS:  Your question is akin to asking a

18    physicist if he's testing Newton's Law, and what I would

19    say is, as an experienced engineer, there are things I

20    don't have to test for.  That's how we move forward.

21    BY MR. TERAN:

22         Q. Okay.  That -- that's it.

23              Now, the next one says, "Collar and tab may

24    even have different coefficients of thermal expansion

25    and forced vibration damping, leading to varying

 1  performance under thermal and vibrational cycling."

 2       Do you see that?

 3       A. I do.

 4       Q. Did you test for this?

 5       A. I don't have to.

 6       Q. Okay.

 7       Did you test for it?

 8       A. No.

 9       Q. Okay.

10       Did you reference any book?  Anything that

11  would support this assertion of yours?

12       A. As an expert, it would be quite foolish of me

13  to use the Court's time -- I'll set yours aside -- on me

14  explaining that urethane has different dimensional and

15  thermal characteristics and vibrational characteristics

16  than hard plastic.

17       So you are correct.  I did not include that

18  kindergarten-level explanation in my report.  I

19  apologize.

20       Q. Is urethane involved in the accused design?

21       A. I've called it a urethane-like.  I hadn't

22  testified to the compositions of their structure.

23       Q. So let me ask again:  Is urethane involved in

24  any way in the accused product?

25       MR. CHEN:  Vague.  Foundation.

```
 1              Go ahead.
 2              THE WITNESS:  I -- I did not gather from the
 3    accused -- the firm that manufactured the accused, the
 4    exact chemical compositions of what they've used.
 5    BY MR. TERAN:
 6         Q. All right.
 7              The reason I asked is, because as you just
 8    referenced, you know, I'm a physicist, I'm an engineer,
 9    or whatever, and this is how urethane behalves.
10         A. You've mischaracterized my answer.  I did not
11    call --
12         Q. Okay.
13         A. -- myself a physicist.
14         Q. All right.
15              Well, you indicated that that's how urethane
16    behaves --
17         A. I'm giving --
18         Q. -- and there's no -- there's no evidence that
19    urethane is even involved in the accused product.
20              So let me ask again:  The statement that you
21    make here, "Collar and tab maybe even have different
22    coefficients of thermal expansion."
23              Do -- does the collar and the tab in the
24    accused product have different coefficients of thermal
25    expansion and forced vibration damping?
```

1          A. Those are different materials quite quickly, so

2     the answer to that is, yes.

3          Q. Okay.

4              How do you know that?

5          A. Because I'm a experienced engineer, and that's

6     why I'm here.  Thank you.

7          Q. Okay.

8              Did you reference anything or did you test to

9     see what the coefficients of thermal expansion and

10    forced vibration damping of the collar and tab in the

11    accused product?

12         A. No.  And nor did I give a primer on how sine

13    waves can be used to represent vibration.

14             My assumption is that, as an engineer, some

15    things are simply understood, and we try to move forward

16    with our opinions.

17         Q. Right.

18             So this is simply understood.  What you made

19    here is -- your assertion is, I don't need to test any

20    of this.  This is simply understood; right?

21             MR. CHEN:  Objection.  Argumentative.

22    Foundation.  Vague.

23             THE WITNESS:  For the sentences that we've been

24    describing -- right? -- these are well-understood

25    principles of materials and construction in automotive.

1        Q. So just because it's an integrated design, um,

2    it yields stable retention force over vibration and

3    therapy cycles?

4        A. The fact that it's integrated versus

5    nonintegrated would make it relatively more stable in

6    those characteristics listed, yes.

7        Q. All right.

8           So the 539 Patent does have those

9    characteristics?

10       A. The 539 Patent, as constructed is an integrated

11   design.

12       Q. Okay.

13       A. And an integrated design would exhibit those

14   things.  Yes, sir.

15       Q. Okay.

16          And then, you go on to say, "The accused design

17   yields different and measurable results."

18          What are those measurable results?  What

19   testing did you do to achieve those measurable results?

20       A. Well, disassembly, for one.

21       Q. Okay.

22          What else?

23       A. Well, I can -- I can palpitate the materials to

24   know those materials have different characterizations.

25       Q. Is that measurable?

```
 1        A. Well, of course.

 2        Q. Did you measure it?

 3        A. It's -- do you want to know to what degree?

 4        Q. No.  No.  I want to know.  You say measurable

 5   design.

 6        A. Sure.

 7        Q. I want to know if you measure that.

 8        A. I -- I can -- I can start.

 9        Q. I know you can.  I'm asking if you did.

10        A. Let me know when I'm allowed to use a compound

11   sentence, sir.

12        Q. Go ahead.

13        A. All right.  I can start by disassembly; right?

14   So is that measurable?  Yes.  I can do it.  Can I do it

15   or not.  If so, how difficult is it; right?

16            Are these all things I can assess?  Can I

17   palpitate the tabs?  Yes.  Can I palpitate the harder

18   ring?  Can I palpitate the rings?  Can I determine that

19   those are different materials with different

20   characteristics?  Yes.

21            Did I put -- did I put those on presses and

22   measure pressures?  Did I take them to failure mode?  No

23   and no.

24            But I certainly can measure those things

25   empirically by beginning with a good field examination,
```

 1  which I did.  That's not hard.

 2       Q. But you didn't measure anything?

 3       A. I did measure.

 4       Q. Okay.

 5           Do you have -- do you have any records of the

 6  examination that you performed on the accused product?

 7       A. No, sir.

 8       Q. Okay.

 9           So you didn't -- you didn't take any notes of

10  what your observations were; you didn't take any notes

11  of what exactly you did; you didn't take any notes of

12  what steps you took in your examination; correct?

13       A. In order to disassemble something and -- and

14  physically examine it, I don't need to -- I don't need

15  an instructional manual often.

16           And, in this case, I didn't, nor did I take

17  notes of what was an apparently rudimentary disassembly

18  and palpitation test procedure.  I didn't go past that

19  to empiric numeric testing.

20       Q. Okay.

21       A. It didn't seem necessary because the

22  differences were so readily apparent.

23       Q. All right.

24           So then, you go on to say, um, some of the

25  measurable results, apparently, include potentially

 1  greater retention decay over time due to the joint

 2  relaxation.

 3         A. Um-hum.

 4         Q. How did you test for this?

 5         A. It's -- it's -- that's why I used the word

 6  "potentially."

 7         Q. So this is a speculation?

 8         A. It's potential, and that's exactly what I've

 9  written.

10         Q. So this is not something that is present in the

11  accused design, the accused product?

12         A. The -- the potential for greater retention

13  decay over time is certainly present, and that's why

14  I've written it as such.

15         Q. Okay.

16             And what is the basis for that?  What is the

17  basis for you saying that the potential for greater

18  retention of decay is greater over time?

19         A. Because of the disparate nature of the

20  materials and the mechanical fastening system.

21         Q. And what is the material?

22         A. We know that one of them is a softer, more

23  elastic material; and one of them is a hard, less

24  elastic material.

25             I've already stated, don't know the exact

TOPFIRE LIMITED, ET AL., vs BENJAMIN D. COOK                                     ERIC NOBLE
2:23-CV-02503-DAD-JDP,  11/07/2025              ORIGINAL                          Page 285

 1  chemical composition.  They both seem to be synthetics.

 2      Q. Okay.

 3          So is that the same for all these that you've

 4  listed, simply that you somehow just know?

 5          You didn't actually test for them.  You didn't

 6  refer to any -- any book, any scientific journal.  You

 7  just simply know, and you put these words into your --

 8  you don't even have a report of any of his -- this

 9  examination that you did.

10          But you -- somehow, you just put these words on

11  your report?

12          Is that -- is that the same, or do we have to

13  go through each one and I ask you what is the basis for

14  this and you give me the same answer?

15          MR. CHEN:  Compound.  Foundation.  Vague.

16  Argumentative.  Thank you.

17  BY MR. TERAN:

18      Q. Go ahead.

19      A. If you can, make your question more specific.

20      Q. Sure.

21          Is -- is -- is it true that you do not have any

22  testing records or records of examination to support any

23  of the assertions that you make here in Paragraph 64 of

24  your report?

25          MR. CHEN:  Compound.  Foundation.  Vague.

TOPFIRE LIMITED, ET AL., vs BENJAMIN D. COOK                    ERIC NOBLE
2:23-CV-02503-DAD-JDP,  11/07/2025              ORIGINAL              Page 286

```
 1        Go ahead.
 2        THE WITNESS:  My -- my assessment -- right? --
 3  I have described to you.
 4  BY MR. TERAN:
 5     Q. No.  I'm sim- -- the question is if you have
 6  any testing results, any testing data, any examination
 7  reports, anything to support the things that you said in
 8  Paragraph 64 of your report.
 9        MR. CHEN:  Vague.  Foundation.  Compound.
10  Argumentative.
11        THE WITNESS:  As a matter of engineering
12  principle -- and this is going to be a compound
13  sentence.
14        Can you live with that?
15  BY MR. TERAN:
16     Q. Go ahead.
17     A. All right.
18        As a matter of engineering principle --
19  right? -- each of the things discussed here, I don't
20  need testing to show.  They are -- they are widely
21  understood, particularly in the automotive field.
22        Compound sentence:  I, therefore, at this
23  point, have not empirically tested those systems to put
24  numeric values to -- to the -- to those descriptions.
25     Q. Well, I don't need numeric values.  I just need
```

TOPFIRE LIMITED, ET AL., vs BENJAMIN D. COOK                                    ERIC NOBLE
2:23-CV-02503-DAD-JDP,  11/07/2025          ORIGINAL                            Page 287

1   some testing that -- that indicates that any of this

2   that you wrote is actually true and accurate.

3       A. Is there a question?

4       Q. Yes.

5           Do you have any anything, any testing, any

6   report, any data, um, that would support that any of the

7   things that you wrote in Paragraphs 63 and 64 of your

8   report is true and accurate?

9       A. Insofar as those are --

10          MR. CHEN:  Objection.  Vague.  Foundation.

11          THE WITNESS:  Sorry.

12          MR. CHEN:  And, um, argumentative.

13          THE WITNESS:  Insofar as those are generally

14  understood principles by automotive engineers, I have

15  not found it necessary to do such testing, nor is it

16  included herein.

17  BY MR. TERAN:

18      Q. All right.

19          And so when you say they're understood

20  principles, um, how is it that they're understood

21  principles?  What did you refer to, um, establish that

22  these are understood principles?

23          MR. CHEN:  Foundation.  Vague.  Compound.

24          Okay.

25          THE WITNESS:  I suppose I could tell you, and

TOPFIRE LIMITED, ET AL., vs BENJAMIN D. COOK                                    ERIC NOBLE
2:23-CV-02503-DAD-JDP, 11/07/2025          ORIGINAL                              Page 288

 1  you could impune me for that, that I've never gone and
 2  done primary fundamental testing on gravity either.  At
 3  some point, as an engineer, I have to understand that
 4  certain relationships exist.
 5          And in order to move forward, I have to take
 6  those as givens.  In this case, the principles I'm
 7  citing in 64 are so rudimentary that any engineer,
 8  particularly in my field of automotive, would look at
 9  them and exclaim, next.
10          And, by that, I mean, yes, widely understood;
11  right?  Did I need to measure to prove any of them?  No.
12  Nobody would.  Could I?  Yes, right.
13          Um, I'm not cheap, and I'd be happy to do it,
14  but, so far, I haven't been asked.
15  BY MR. TERAN:
16      Q. You haven't been asked to do any of this
17  testing?
18      A. I hadn't been asked to do empirical numeric
19  testing to back up sentences like in 64 because, as an
20  expert, it's assumed that I understand rudimentary
21  principles in my field.
22      Q. So you were not asked to do any sort of
23  analysis?
24          MR. CHEN:  Foundation.  Vague.  Misstating
25  prior testimony.  Argumentative.

TOPFIRE LIMITED, ET AL., vs BENJAMIN D. COOK                                    ERIC NOBLE
2:23-CV-02503-DAD-JDP,  11/07/2025              ORIGINAL                        Page 386

```
 1  STATE OF CALIFORNIA         )
                                )
 2                              )    ss
                                )
 3  COUNTY OF LOS ANGELES       )
    _____)

 4

 5

 6          I, SONSERAYE ANDERSON, Certified Shorthand

 7  Reporter qualified in and for the State of California,

 8  do hereby certify:

 9          That the foregoing transcript is a true and

10  correct transcription of my original stenographic notes.

11          I further certify that I am neither attorney

12  or counsel for nor related to or employed by any of the

13  parties to the action in which this proceeding was

14  taken; and furthermore, that I am not a relative or

15  employee of any attorney or counsel employed by the

16  parties hereto or financially interested in the action.

17          IN WITNESS WHEREOF, I have hereunto set my

18  hand this 9th day of December, 2025.

19

20

21

22  _____

23  SONSERAYE ANDERSON
    CSR No. 14187

24

25
```

Coalition Court Reporters | 213.471.2966 | www.ccrola.com